897 F.2d 570
 283 U.S.App.D.C. 116
 TRANSWESTERN PIPELINE COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
The Public Utilities Commission of the State of California,
Process Gas Consumers Group, Southern California Gas
Company, El Paso Natural Gas Company, Pacific Gas and
Electric Company, Texas Eastern Transmission Corporation,
The Kansas Power and Light Company, Southwest Gas
Corporation, Williams Natural Gas Company, Intervenors.
TRANSWESTERN PIPELINE COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Southern California Gas Company, Southwest Gas Corporation,
Pacific Gas and Electric Company, Williams Natural Gas
Company, Public Utilities Commission of the State of
California, El Paso Natural Gas Company, Citizens Energy
Corporation, et al., Intervenors.
TRANSWESTERN PIPELINE COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Williams Natural Gas Company, Southern California Gas
Company, Public Utilities Commission of the State
of California, Intervenors.
TRANSWESTERN PIPELINE COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Kansas Power & Light Company, Natural Gas Clearinghouse,
Inc., Williams Natural Gas Company, Southern California Gas
Company, Public Utilities Commission of the State of
California, Pacific Gas & Electric Company, PSI, Inc., Texas
Eastern Transmission Corp., Southwest Gas Corp., Intervenors.
PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Kansas Power & Light Company, Natural Gas Clearinghouse,
Inc., Williams Natural Gas Company, Southern California Gas
Company, Pacific Gas & Electric Company, PSI, Inc.,
Southwest Gas Corp., Transwestern Pipeline Company, Intervenors.
KANSAS POWER & LIGHT COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Natural Gas Clearinghouse, Inc., Williams Natural Gas
Company, Pacific Gas & Electric Company, Public Utilities
Commission of the State of California, Southern California
Gas Company, PSI, Inc., Transwestern Pipeline Company, Intervenors.
 Nos. 88-1046, 88-1371, 88-1484, 88-1555, 88-1559 and 88-1573.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 30, 1989.
Decided March 23, 1990.
 
 Petitions for Review of an Order of the Federal Energy Regulatory Commission.
 Harvey Y. Morris and Martin J. Bregman, Topeka, Kan., with whom Janice E. Kerr, San Francisco, Cal., J. Calvin Simpson, for Public Utilities Com'n of the State of Cal., John K. Rosenberg, Topeka, Kan., William I. Harkaway and Harvey L. Reiter, Washington, D.C., for the Kansas Power and Light Co., were on the joint brief, for Public Utilities Com'n of the State of Cal., et al., petitioners in Nos. 88-1559, 88-1573 and intervenors in Nos. 88-1046, 88-1371, 88-1484 and 88-1555.
 William J. Grealis, with whom Jeffrey G. DiSciullo, Frederick W. Peters, Dana B. Ott, Washington, D.C., Sherrie N. Rutherford, Cheryl M. Foley, Houston, Tex., Charles A. Moore, Marilyn L. Doria and Robert W. Gee, Houston, Tex., were on the brief, for Transwestern Pipeline Co., petitioner in Nos. 88-1046, 88-1371, 88-1484, 88-1555, and intervenor in Nos. 88-1559 and 88-1573.
 Dwight C. Alpern, Atty., F.E.R.C., with whom Catherine C. Cook, Gen. Counsel, and Jerome M. Feit, Sol., F.E.R.C., were on the brief, for respondent in all cases. Hanford O'Hara, Atty., F.E.R.C., Washington, D.C., also entered an appearance, for respondent.
 
 
 1
 Douglas Kent Porter and E.R. Island, Los Angeles, Cal., entered appearances, for intervenor Southern Cal. Gas Co. in Nos. 88-1046, 88-1371, 88-1484, 88-1555, 88-1559, and 88-1573.
 
 
 2
 Joshua Bar-Lev, San Francisco, Steven F. Greenwald and Lindsey How-Downing, San Francisco, entered appearances, for intervenor Pacific Gas and Elec. Co. in Nos. 88-1046, 88-1371, 88-1555, 88-1559 and 88-1573.
 
 
 3
 Gregory Grady and Douglas O. Waikart, Washington, D.C., entered appearances, for intervenor Williams Natural Gas Co. in Nos. 88-1046, 88-1371, 88-1484, 88-1555, 88-1559 and 88-1573.
 
 
 4
 Edward J. Grenier, Jr., William H. Penniman, and James M. Bushee, Washington, D.C., entered appearances, for intervenor Process Gas Consumers Group in No. 88-1046.
 
 
 5
 William I. Harkaway, Washington, D.C., Douglas M. Canter and Steven J. Kalish, Washington, D.C., also entered appearances, for intervenor Southwest Gas Corp. in Nos. 88-1046, 88-1371, 88-1555 and 88-1559.
 
 
 6
 Judy M. Johnson and John S. Carr entered appearances, for intervenor Texas Eastern Transmission Corp., in Nos. 88-1046 and 88-1555.
 
 
 7
 Richard C. Green, Donald J. MacIver, Jr., El Paso, Tex., Richard Owen Baish and Michael D. Ferguson, El Paso, Tex., entered appearances for intervenor El Paso Natural Gas Co. in Nos. 88-1046 and 88-1371.
 
 
 8
 Peter G. Esposito, Washington, D.C., entered an appearance, for intervenor Natural Gas Clearinghouse, Inc., in Nos. 88-1555, 88-1559 and 88-1573.
 
 
 9
 Daniel C. Kaufman and James U. Hamersley, Washington, D.C., entered appearances, for intervenor PSI, Inc., in Nos. 88-1555 and 88-1559.
 
 
 10
 Before WILLIAMS, D.H. GINSBURG and SENTELLE, Circuit Judges.
 
 
 11
 Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.
 
 STEPHEN F. WILLIAMS, Circuit Judge:
 
 12
 This appeal grows out of the Federal Energy Regulatory Commission's attempt to afford natural gas consumers the benefits of increased competition. Its basic stratagem was to "unbundle" the sale of gas from its transportation, enabling local distribution companies and end-users to buy gas in the field and to use interstate pipelines simply for transportation. See Order No. 436, Regulation of Natural Gas Pipelines after Partial Wellhead Decontrol, 50 Fed.Reg. 42,408 (1985). In Associated Gas Distributors v. FERC, 824 F.2d 981 (D.C.Cir.1987), this court upheld the substance of the Commission's new approach, but vacated and remanded Order No. 436 because the Commission had failed to address adequately the effect of its new regulations on the interstate pipelines' take-or-pay liability. Because Order No. 436 put pressure on pipelines to allow shipments of gas in competition with their own supplies, it increased their difficulties in selling (without loss) quantities of gas that they were obligated to either take or pay for. On remand, the Commission sought to offset these difficulties by shifting some of the costs onto producers and customers. See Order No. 500, Regulation of Natural Gas Pipelines after Partial Wellhead Decontrol, 52 Fed.Reg. 30,334 (1987). Challenges to the order were consolidated into one complex case, the first phase of which addressed a facial challenge to the entire order, and the second phase of which considered the application of the Commission's "equitable sharing" policy to a particular pipeline. See American Gas Association v. FERC, 888 F.2d 136 (D.C.Cir.1989) (Phase I); Associated Gas Distributors v. FERC, 893 F.2d 349 (D.C.Cir.1989) (Phase II).
 
 
 13
 This segment of the case was intended to address issues raised by a so-called gas inventory charge, also known by the acronym GIC. Here the Commission's object was to define the limits on pipelines' ability to charge their customers for the costs of maintaining an inventory of contract rights to purchase gas (including one form those costs may take, namely liability under contracts requiring a pipeline to take gas or pay for it anyway), and thereby to prevent recurrence of the recent take-or-pay pass-through issues.[1] The Commission originally discussed the charge as a policy statement within Order No. 500 and later implemented it in a number of specific decisions, including the one now before us.
 
 
 14
 Although a large number of cases were filed challenging FERC implementation of the gas inventory charge, the present case was jointly selected by the parties as the most suitable one for its review; the remainder were held in abeyance. As will be developed below, most of the key issues in this case have been rendered moot. The only customers of Transwestern potentially affected by Transwestern's gas inventory charge proposals have ceased to purchase gas from that pipeline, and nothing before us suggests that any judicial correction of FERC's asserted errors would restore gas sales transactions. A number of peripheral issues survive mootness, but the upshot is that this case has failed as the selected vehicle for review of the Commission's actions on gas inventory charges.
 
 
 15
 * Before turning to the Commission's disposition of Transwestern's gas inventory charge proposal, we must first clear out of the way Transwestern's attack on the Commission's rejection of its earlier filing, in June 1986, of a proposal for a somewhat similar charge, then called a "supply reservation charge."[2] The Commission rejected the filing and set it down for a hearing. 36 FERC p 61,048 at 61,104 (1986). After hearing, the ALJ rejected the proposal, 39 FERC p 63,025 (1987), and the Commission affirmed. 40 FERC p 61,324 at 61,994-95 (1987). The Commission found the proposed charge too vague since crucial terms--such as the amount of the charge and its relation to Transwestern's actual cost of reserving supplies--depended on the outcome of negotiations with Transwestern's producers, which it had not then completed. Transwestern, 40 FERC at 61,995.
 
 
 16
 Transwestern tells us that the Commission's objection, the proposal's lack of specific figures, is of no weight: Transwestern offered the supply reservation charge only as a "mechanism." We do not believe that as an ordinary matter a pipeline's attachment of the "mechanism" label requires the Commission to dispense with insistence on specific figures. Of course that may be so where a pipeline offers to establish that market forces will hold charges to just and reasonable levels and submits adequate support for the claim. But in the absence of some such special circumstance the Commission's position seems entirely reasonable. Here, although the proposed charge was designed to cover Transwestern's cost of maintaining gas supplies, Transwestern could offer no actual evidence of the costs because it had not yet completed negotiations with any of its producers. Id. The Commission was surely not arbitrary or capricious in declining "to allocate risks and unknown future costs between the pipeline and its customers in a vacuum." 40 FERC at 61,996.
 
 
 17
 Transwestern also complains that FERC applied its Order No. 500 policy statement after the record was closed and even though its proposal was filed before Order No. 500. This is simply not true. After rejecting Transwestern's proposal as "not sufficiently developed," the Commission noted that any new proposal should look to the principles stated in Order No. 500. 40 FERC at 61,995. Where an agency has rejected a proposal on legitimate standards, its offer of a helpful hint as to criteria for the future is not the same as reliance on the latter.
 
 II
 
 18
 After Transwestern's 1986 filing was rebuffed, it submitted in December 1987 a filing under Sec. 4 of the Natural Gas Act, 15 U.S.C. Sec. 717c (1988), in which it sought to avoid future take-or-pay problems by implementing a gas inventory charge in accordance with Order No. 500. Under the proposal, a customer would nominate in advance the amount of gas it intended to buy from Transwestern for a specified period. Before nominations were due, Transwestern would publish the relevant prices--rate schedules for the purchase of gas, and the gas inventory charge, i.e., a charge for each unit of gas nominated but not taken, somewhat equivalent to a liquidated damages clause in a longterm purchase contract. Joint Appendix ("J.A.") 225-26, 242, 256-58. The actual amount of the charges would be up to Transwestern, which argued that competitive market forces would keep them at just and reasonable levels. Id. at 263-64.
 
 
 19
 In a companion filing under Sec. 7 of the Natural Gas Act, 15 U.S.C. Sec. 717f,Transwestern proposed that whenever a customer's nomination fell below its certificated firm sales entitlement, the unused entitlement would be automatically abandoned and converted to an entitlement to firm transportation. J.A. 228-29.
 
 
 20
 The Commission rejected the Sec. 4 filing because it found that the service to be provided was not covered by Transwestern's existing certificate, and redocketed the whole matter for hearing and decision under Sec. 7. See Transwestern Pipeline Co., 41 FERC p 61,371 (1987) (Order Redocketing Filing); 42 FERC p 61,370 (1988) (Order Denying Rehearing). The Commission later accepted the proposal, subject to two conditions, of which more will be said later. 43 FERC p 61,240 (1988) (Order); 44 FERC p 61,164 (1988) (Order Granting Rehearing in Part and Clarifying Prior Order).
 
 
 21
 Attacks on the Commission's action come from two sides. Transwestern itself attacks the decision to redocket the entire proposal under Sec. 7, which prevented its new rates from going into effect promptly under Sec. 4. It also attacks the two conditions attached by the Commission. On the other side, two parties that we will loosely call downstream purchasers attack the Commission's conclusion that market forces will hold Transwestern's rates to just and reasonable levels, and attack the gas inventory charge as equivalent to "minimum bills," which the Commission has previously found (for most contexts) inconsistent with just and reasonable rates. See, e.g., Order No. 380, Elimination of Variable Costs from Certain Natural Gas Pipeline Minimum Commodity Bill Provisions, Stats. & Regs. [Regulations Preambles] p 30,571 (1984) at 30,970-71 (eliminating recovery in minimum bills of take-or-pay costs), aff'd, Wisconsin Gas Co. v. FERC, 770 F.2d 1144 (D.C.Cir.1985); see also Transwestern Pipeline Co., 32 FERC p 61,009 at 61,031 (1985) (eliminating fixed-cost minimum bill entirely in order to prohibit guaranteed recovery of equity return, related taxes, and fixed production costs), aff'd, Transwestern Pipeline Co. v. FERC, 820 F.2d 733 (5th Cir.1987). They also attack the Commission's decision to allow Transwestern to bill its customers for the accumulated balance in its so-called Account No. 191, an account used to implement the "purchased gas adjustment" or "PGA" that pipelines have been allowed but that would terminate under Transwestern's proposal.
 
 
 22
 One of the two parties asserting these latter views, Kansas Power & Light Company, is in fact a downstream purchaser, buying supplies from Transwestern's customer Williams Natural Gas Company; the other, the California Public Utilities Commission, is a state regulatory agency seeking to advance the interests of downstream purchasers from another Transwestern customer, Southern California Gas Company ("SoCal").
 
 
 23
 Transwestern has only two customers who are potentially affected by the forward-looking aspects of the Commission's decision, Williams and SoCal. Both have elected to purchase no gas from Transwestern under the new scheme. As we shall develop below, this moots most of the attacks made by both sides. It leaves in place, however, the downstream purchasers' contention that Transwestern's scheme for disposition of its Account No. 191 balance violates the rule against retroactive ratemaking, and an aspect of Transwestern's attack on the conditions attached by the Commission.
 
 Mootness of Attack on GIC Mechanism
 
 24
 A case is moot if events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future. See, e.g., Friends of Keeseville, Inc. v. FERC, 859 F.2d 230, 234 (D.C.Cir.1988) (review may not be premised on "bare possibility" that agency action would lead to injury); Wright, Miller, Cooper, Federal Practice and Procedure Sec. 3533.3 at 273-74 (1984) (moot if prospect of future effects "too remote to justify decision").
 
 
 25
 Here, both Williams and SoCal--Transwestern's only customers possibly affected by the GIC under review here--have elected not to purchase any gas from Transwestern under the newly approved certificate. Williams exercised its option to terminate its sales service agreement with Transwestern on February 1, 1988, to take effect February 1, 1989. See J.A. 380-81. SoCal continued its relationship longer, but on September 15, 1989 elected under the provisions of the Transwestern tariff approved here to nominate purchases of zero, thereby converting its entire sales entitlement to transportation. See Motion of Transwestern Pipeline Company to Lodge Documents and Suggestion of Possible Mootness, Appendix A. As a result, regardless of a decision by this court on the merits of the challenged gas inventory charge, the downstream purchasers acknowledge that "no GIC charges will ever be assessed against [Transwestern's] customers." Answer of the Kansas Power and Light Company and the Public Utilities Commission of the State of California to Motion of Transwestern Pipeline Line [sic] Company to Lodge Documents and Suggestion of Possible Mootness ("Answer") at 2. Accordingly these petitioners cannot be affected by the gas inventory charge or by whatever ruling we might make on it.[3]
 
 
 26
 The downstream purchasers suggest that future effects are likely by arguing that Commission approval of Transwestern's proposals "coerce[d]" SoCal into permanently abandoning its sales service. Id. at 3. (No one makes this suggestion as to Williams, which terminated its sales service from Transwestern after the latter filed its proposals but on the basis of prior arrangements and before the Commission approved Transwestern's proposal.) Assuming that a favorable decision on the downstream purchasers' claims would entitle SoCal to reverse that election, such a decision could favorably affect them. But the benefit for the downstream purchasers could arise only if SoCal were actually to seek to reverse its earlier decision. Far from doing so, it displays a complete lack of interest in this appeal even though it was actively engaged in the proceedings below. Indeed, even before Transwestern's filing of its gas inventory charge proposals, SoCal had been steadily shifting its relation with Transwestern from gas purchaser to transportation user, buying its gas elsewhere. See Transwestern's October 1987 Request for Rehearing of the Commission's denial of its 1986 filing, J.A. 156. Without so much as a nod from SoCal (or some authoritative statement reconciling the absence of a nod with the purchasers' image of SoCal as victim), the causal chain is far too tenuous.
 
 
 27
 Finally, the downstream purchasers argue that because Transwestern's billing of the balance of its Account No. 191 is not moot (on which we agree), we must decide the validity of the gas inventory charge because it was "the predicate" of the Commission's approval of the Account No. 191 billing. Answer at 7. While it is true that Transwestern's attempted shift to sales under a gas inventory charge precipitated its proposal for billing of Account No. 191 balances, any end of its purchased gas adjustment system would have raised the same issue. The link to the gas inventory charge is quite fortuitous. There is no reason why the Account No. 191 tail should wag the gas inventory charge dog back to life.
 
 
 28
 Billing of Prior Gas Cost Balances ("Account No. 191") to
 
 Departing Customers
 
 29
 Transwestern's 1987 filing entailed a complete alteration of its rates for "bundled" service, i.e., its own sales of gas at the end of its pipeline. Formerly the gas component was based on forward projections of historical costs, with provision for adjustment in the next period for any differences; thereafter, competition was expected to hold the gas component to the level of true economic costs. This created a transition problem--the treatment of the leftover differences between Transwestern's projections and its actual experience, which in this case was a deficit. Transwestern sought to charge Williams and SoCal for these leftovers, even if both ceased buying gas from Transwestern altogether. Obviously there is no mootness objection here; if the charges are lawful, Transwestern will collect them. Finding the record unclear as to whether some portion of the charge may be barred by the filed rate doctrine, we remand to the Commission for its resolution of that issue.
 
 
 30
 Before 1972 pipelines based the gas cost component of their sales rates on a projection of their recent purchase prices into the future. Because of the rapid escalation of wellhead prices then under way, they were continually falling behind, and, to minimize their losses, frequently filed new rates under Sec. 4 of the Natural Gas Act. To reduce this frequency, the Commission in 1972 promulgated a system for more direct tracking of purchase prices. As before, a pipeline would project historical prices into the future. But when its experience in the next six months differed from the projection (as presumably it always did), the difference was added to or subtracted from the rates for the next six months, in a so-called purchased gas adjustment or PGA. See Order No. 452, Purchased Gas Cost Adjustment Provision in Natural Gas Pipeline Companies' FPC Gas Tariffs, 47 FPC 1049, 1050-51 (1972); see also Standard Form for Purchased Gas Adjustment Filings Submitted by Natural Gas Pipeline Companies, Regulations Preambles [1982-1985], Stats. & Regs. p 30,515 at 30,786; see generally 18 CFR Secs. 154.301-154.310 (1989). The figures describing the difference between projection and experience were reflected in each pipeline's "Account No. 191."
 
 
 31
 As the certificate approved by the Commission here altogether dropped the system of projecting rates from past experience, the entire theory underlying the PGA and Account No. 191 became irrelevant. Transwestern, however, sought authority under which, if both customers nominated zero purchases under the new certificate, it could bill them any amounts remaining unrecovered in its Account No. 191 at the moment of transition (in proportion to their contract demand in the prior period). The Commission agreed. 43 FERC at 61,653.
 
 
 32
 The filed rate doctrine prohibits the Commission from imposing a rate different from the one on file at the time gas is sold or service made available. It allows purchasers of gas to know in advance the consequences of the purchasing decisions they make, see Columbia Gas Transmission Corp. v. FERC, 831 F.2d 1135, 1141 (D.C.Cir.1987) (quoting Electrical District No. 1 v. FERC, 774 F.2d 490, 493 (D.C.Cir.1985), and extending it from the Commission's "fix[ing]" of rates under Sec. 5 to its approval of rates filed under Sec. 4 but imposed on purchasers in proportion to their prior gas purchases), although, as we shall see, a customer's ability to escape a charge may as a practical matter be seriously constrained despite the doctrine.
 
 
 33
 Our decisions on the necessary notice have not been altogether clear. In Electrical District the Commission sought to make a rate effective under Sec. 5 as of the date it ordered the pipeline to make a compliance filing rather than the date on which the Commission accepted the compliance filing. Even though the purchasers of the electricity in that case could evidently have estimated with some precision the rates the compliance filing would impose, the court held that the Commission's attempt to make the new rate effective as of the earlier date violated the filed rate requirement because the purchasers did not know the "numerical rate" they would be charged. Id. at 492. The court recognized that specificity of notice is often a matter of degree but rejected as too amorphous a standard that would turn on such degrees. Instead it adopted a bright-line insistence that a numerical rate be "specified." Id. at 492-93; see also Public Service Co. of New Mexico v. FERC, 832 F.2d 1201, 1225 (10th Cir.1987) (adopting rule of Electrical District ).
 
 
 34
 On the other hand, in Public Service Co. of New Hampshire v. FERC, 600 F.2d 944 (D.C.Cir.1979), the court addressed an electrical utility's ability to collect for costs that were left over as a result of transition from one billing system to another. It drew a distinction between "fixed rate" tariffs, charging a "predetermined price per unit based on costs incurred during some past test period, subject to some adjustments," and "cost of service" tariffs, which as understood by the court precisely tracked actual fuel costs but which required "deferred billing." Id. at 948. Under the latter system, as evidently envisaged by the court, a customer would not know until (say) March the unit price due for January's usage; on billing, it would pay the then-revealed rate times the quantity taken.[4] While the court said that the rule against retroactive ratemaking would be no bar to collection of the leftovers if the outgoing system had been cost of service, it found that system to have been a fixed rate tariff, and therefore held the leftovers uncollectible. Id. at 950. Thus the court was clearly untroubled by a rate system under which a customer could not know the exact charge for service in a given period until after the end of the period. This is far less than what Electrical District viewed as the minimum.
 
 
 35
 But we think the two cases can be reconciled. The Commission need not confine rates to specific, absolute numbers but may approve a tariff containing a rate "formula" or a rate "rule" (as Public Service Co. of New Hampshire assumed); it may not, however, simply announce some formula and later reveal that the formula was to govern from the date of announcement (as it had done in Electrical District ). We recognize that this view of Electrical District fails to implement its objective of eliminating the problems of drawing lines as to what notice is adequate, but we think that where the Commission explicitly adopts a formula and indicates when it will take effect, courts may not (without invading the Commission's province) say that such a formula may never qualify as a "rate" within the meaning of Sec. 4 or Sec. 5 of the Natural Gas Act. See Chevron USA, Inc. v. Natural Resources Defense Council, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).
 
 
 36
 Moreover, this approach is a natural corollary of the rule that Electrical District's insistence on absolute precision does not apply where the parties have agreed that rates shall take effect before their exact formulation. See Panhandle Eastern Pipe Line Co. v. FERC, 881 F.2d 1101, 1120-21 (D.C.Cir.1989) (rejecting argument that Electrical District trumps parties' agreement to the contrary); see also Public Service Co. v. FERC, 851 F.2d 1548, 1556-57 (5th Cir.1988) (same).[5] A tariff that is filed under Sec. 4 and accepted by the Commission is itself a kind of substituted contract--with the Commission acting as a referee of the competing interests (custom ers,, pipelines), making sure that the utility's monopoly power does not bring about rates that are materially worse for the customers than what they could get for themselves under competition.
 
 
 37
 Here the Commission by order of May 11, 1988 approved Transwestern's proposed certificate, with its provision for disposition of Account No. 191 balances. It provided that if SoCal nominated zero (the Commission was already aware of Williams's zero nomination), the balance remaining in Account No. 191 would be divided between the customers in accordance with their respective contract entitlements (85.7% for SoCal and 14.3% for Williams). 43 FERC at 61,653.
 
 
 38
 The downstream purchasers note that as matters worked out, this put SoCal in a difficult position. Since Williams opted out on February 1, 1988, SoCal knew that under the May 11, 1988 order it would bear either the whole charge (if it elected any sales service) or its proportionate amount (if it elected none), "two unappealing options." Downstream purchasers' Initial Brief at 14. That options may be unappealing, however, does not make the Commission's presentation of them an automatic violation of the filed rate doctrine. In any event, the first of the options (SoCal bearing the whole charge if it continued to take sales service) was no more than what would have happened under the existing PGA regulations, before the new Transwestern filing, under the same circumstances. See Kentucky West Virginia Gas Co., 37 FERC p 61,310 (1986), reh'g denied, 44 FERC p 61,044 (1988), appealed, Nos. 88-4663 (5th Cir.) and 88-3820 (6th Cir.).
 
 
 39
 As to Williams, the Commission's position is more difficult. First, Williams elected on February 1, 1988 to end its purchase entitlements effective February 1, 1989, so that it had cast its die before the Commission's May 11, 1988 statement of the consequences. Nonetheless, it continued to be the beneficiary of its contract entitlement from May 11, 1988 until February 1, 1989, and its actual takes of gas in that period played a role in determining the size of the Account No. 191 balance. That Williams could have avoided the charge only by accelerating the abandonment of service--an avenue that was probably not open to it as a practical matter--does not make the charge a violation of the filed rate doctrine. All adjustments in fixed charges after the customer first joins the system, i.e., in all charges not directly correlated with actual takes (such as a commodity charge), suffer from that feature. In so far as prior discussions in our cases have suggested that a rate violates the filed rate doctrine simply because a customer cannot respond in some way that enables it to escape the charge, see, e.g., Columbia Gas, 831 F.2d at 1141 (quoting Electrical District, 774 F.2d at 493); see also Associated Gas Distributors v. FERC, 893 F.2d 349, 356-57 (D.C.Cir.1989), such remarks were clearly inconsistent with the acknowledged power of the Commission to establish, and to alter prospectively, fixed charges such as demand charges, avoidable if at all only through the elaborate process of securing abandonment under Sec. 7 of the Act.
 
 
 40
 Account No. 191 balances accrued after the termination of Williams's purchase entitlements on February 1, 1989 pose another problem. In that period it neither received nor was entitled to receive service. We can see little sense in such a charge; it certainly violates the Commission's policy of attempting to match revenues from each class of customers with their respective responsibility for costs. See, e.g., Alabama Electric Cooperative, Inc. v. FERC, 684 F.2d 20, 27 (D.C.Cir.1982). But no one has attacked the Commission's treatment of the PGA balance on that basis, before us or on rehearing before the Commission, so we have no jurisdiction to consider the matter. See Sec. 19 of the Act, 15 U.S.C. Sec. 717r. In sum, then, we see no obstacle under the filed rate doctrine to Transwestern's collection of Account No. 191 balances accrued after the May 11, 1988 order.
 
 
 41
 It appears, however, that some portion of the PGA balances remaining at June 30, 1989 may have accrued before May 11, 1988. Commission Brief at 63 n. 44. Accordingly we must examine the Commission's contentions that it had previously made clear that the balances would be collectible against departing customers if all jumped ship. The prior occasions consist of its promulgation of the PGA regulations themselves and two 1986 decisions, relating to other pipelines, in which it allowed catch-up of the balances. We reject both theories.
 
 
 42
 Under the PGA regulations, a customer who leaves the system is normally no longer responsible for any adjustment costs. See Kentucky West Virginia Gas Co., 37 FERC at 61,912.[6] But the Commission argues that because its preamble to the regulations asserted the purpose of "assur[ing] [pipelines] the recovery of all purchased gas costs," Order No. 452, 47 FPC 1049, 1051, modified, 47 FPC 1510 (1972), modified, 49 FPC 84 (1973), Transwestern's customers had notice since 1972 that these balances would follow them if the PGA system ended altogether. We find these expressions of PGA purposes inadequate to such a task. The scenarios of multiple departures, culminating in a complete end of PGA sales, are varied and complex, and there are other policy values that a customer might think would also bear upon the Commission's resolution of such an issue. Suppose, for instance, each of 20 customers left a system seriatim, the last accounting only for 5% of the pipelines' sales. Would the Commission policy in favor of assuring pipelines' full recovery of costs trump its policy in favor of having prices track responsibility for costs? Where circumstances suggest many approaches to a problem and many values requiring consideration, the Commission's assertion of a policy goal in one context is hardly the same as a rule implementing that goal in every other context.
 
 
 43
 The Commission also would have us find notice in two 1986 decisions. In Western Gas Interstate Co., 34 FERC p 61,122, reh'g denied in part, 35 FERC p 61,012 (1986), the Commission allowed a pipeline to bill its sole remaining customer the balance of its Account No. 191 after it received authority to abandon the relevant service. 34 FERC at 61,197; see also 35 FERC at 61,020 (Order on Rehearing). In Locust Ridge Co., 37 FERC p 61,295 (1986), the Commission also allowed a pipeline terminating its PGA filings to "refund or direct bill the remaining balance" in its Account No. 191. 37 FERC at 61,883. Since these cases did not involve Transwestern's system, they could provide notice only in the sense of representing the state of FERC law interpreting the earlier PGA regulations.
 
 
 44
 Both of the decisions are quite summary and lack any analysis of the issue. Neither purports to lay down any sort of general rule for the treatment of Account No. 191 balances on complete termination of service. When FERC disallowed recapture by direct billing against a single departing customer, in Kentucky West Virginia Gas Co., it relied not only on the pipeline's ability to collect the deficiencies from remaining customers but also on its finding that customers had inadequate notice that they would be charged for these costs. While now FERC explains that the first point was controlling, see Commission Brief at 61 n. 41, Kentucky West Virginia did not say so, and did not even mention the earlier brief orders allowing direct billing. Even if Kentucky West Virginia is ultimately reconcilable with Locust Ridge and Western Gas, we can hardly impute adequate notice to Transwestern's customers merely because their lawyers, if put to work on the problem, might have divined a theory reconciling the cases.[7]
 
 
 45
 Finding no meaningful notice in any Commission act before May 11, 1988, we remand the case to the Commission for it to determine what portion of the Account No. 191 deficiency accrued thereafter.
 
 
 46
 Transwestern's Attack on the Commission's Redocketing its
 
 Sec. 4 Filing with its Sec. 7 Filing
 
 47
 It will be recalled that Transwestern filed its new rate proposals, including its gas inventory charge, under Sec. 4, together with a companion filing under Sec. 7 for an amendment to its certificates such that a nomination below a customer's certificated entitlement would result in abandonment of the excess. Viewing the two as inextricably linked, the Commission rejected the Sec. 4 filing and redocketed it under Sec. 7. See supra, at 574-75. Thus, says Transwestern, the Commission delayed the time as of which it could secure the benefit of the new rates.
 
 
 48
 We find the claim as moot as the downstream purchasers' objections to the Commission's approval of the Transwestern rate scheme, and for the same reasons. As a result of Williams's and SoCal's zero nominations, no rates have ever been or will ever be charged under the Commission decision.[8] Had the Commission accepted Transwestern's Sec. 4 filing as such, its customers would simply have been forced to decide earlier whether to terminate their sales service with Transwestern. Transwestern has offered no basis for believing that an earlier effective date would have resulted in positive nominations. The sole respect in which Transwestern's rates would have been more attractive independently of the Sec. 7 filing is that nominations lower than firm sales entitlement would not have immediately triggered abandonment, but in view of the Sec. 7 filing, customers deciding on nominations presumably would have considered the prospect of Commission approval. It is speculative in the extreme to suggest that this shadowy distinction would have produced different results.
 
 
 49
 Transwestern's Attack on Conditions Attached to the Certificate
 
 
 50
 The Commission subjected Transwestern's proposed certificate to two conditions. Transwestern objects, but we find its objection to the first moot and we find Transwestern not aggrieved by the second condition within the meaning of Sec. 19(b), 15 U.S.C. Sec. 717r(b).
 
 
 51
 First, FERC prohibited Transwestern from charging SoCal an "exit fee" in the event that it nominated no sales service under the certificate. See 43 FERC p 61,240 at 61,654. No one has pointed us to anything in Transwestern's filings proposing an exit fee that would have applied to initial zero purchase decisions, and in any event, in Transwestern's petition for rehearing it challenged only the Commission's prohibiting it from "assess[ing] an exit fee if Southern California first commits to purchases under the GIC and subsequently reduces its nominations." 44 FERC at 61,536 (emphasis added); see also id. at 61,535. As this scenario cannot occur, the issue is moot.
 
 
 52
 In its second condition, the Commission prohibited Transwestern, after acceptance of the certificate, from "recover[ing] take-or-pay prepayment, buyout or buydown costs incurred after the date this certificate is accepted other than through the GIC mechanism." 43 FERC at 61,658. It distinguished between those costs and "costs that have already been paid or which are known and measureable through reference to binding written agreements entered into before acceptance of the GIC certificate," 44 FERC at 61,535, the latter type being still recoverable through the Order No. 500 "equitable sharing" despite the acceptance of a GIC certificate.
 
 
 53
 The Commission insists that a certificate condition appearing to bar a utility from proposing, or itself from accepting, a specified type of rate, does not in fact do so in the absence of special circumstances. In Tennessee Gas Pipeline Co. v. FERC, 689 F.2d 212, 214-15 (D.C.Cir.1982), we upheld the Commission's attachment of a condition to a Sec. 7 certificate that seemed to bar a specific type of rate filing under Sec. 4 because we did not read the condition as actually precluding such a filing. We distinguished Algonquin Gas Transmission Co. v. FPC, 534 F.2d 952 (D.C.Cir.1976), on the ground that there the Commission had already rejected a nonconforming Sec. 4 filing because it felt bound by the earlier condition, making the permanency of the condition appear rock-solid. Here the condition as to take-or-pay recovery appears no more permanent than the one found unobjectionable in Tennessee Gas.
 
 
 54
 Even if Transwestern could reasonably have read the condition as binding, its only potential loss appears to have been its inability to recover a greater share of its take-or-pay costs under the "equitable sharing" mechanism. In Associated Gas Distributors v. FERC, 893 F.2d 349 (D.C.Cir.1989), however, we struck down the equitable sharing mechanism as a violation of the filed rate doctrine. Id. at 354-57. As a result, we now know that that avenue of recovery was foreclosed. With Transwestern free to make new, nonconforming proposals for recovery of take-or-pay costs of the type the Commission appeared to bar, we cannot find Transwestern aggrieved by the take-or-pay exclusivity provision as required for our jurisdiction under Sec. 19(b) of the NGA.
 
 Conclusion
 
 55
 We find the downstream purchasers' claim that the treatment of Transwestern's Account No. 191 balances violates the filed rate requirement valid only in so far as those balances were accrued before May 11, 1988, and remand the case for making any necessary adjustment; we dismiss their other objections as moot. We reject on the merits Transwestern's claim that the Commission should have accepted its 1986 filing, we dismiss as moot its objections both to the Commission's coalescing of its 1987 Sec. 4 and Sec. 7 filings and to the imposition of an exit fee prohibition, and we find it not aggrieved by the take-or-pay exclusivity condition.
 
 
 56
 So ordered.
 
 
 
 [1]
 We deferred addressing the validity of the GIC policy statement in Phase I of these complex proceedings because it was unripe until applied in a concrete setting. See AGA, 888 F.2d at 152
 
 
 [2]
 It also sought to recover from its firm sales customers 100% of its costs in buying out and buying down existing take-or-pay contracts. The Commission rejected this part of the filing and Transwestern has not sought review of that rejection here
 
 
 [3]
 This is not a case where the parties have challenged the validity of both an ongoing practice and a now moot application of that practice. In such a case, this court has held the specific application moot, but gone on to decide the more general claim. See, e.g., Payne Enterprises, Inc. v. U.S., 837 F.2d 486, 490-91 (D.C.Cir.1988) (suit to compel disclosure of documents made under FOIA request moot as to documents subsequently disclosed, but not as to challenge to agency "policy or practice" which resulted in initial denial of request). Here, by contrast, no party challenges the general validity of the policy statement regarding gas inventory charges in Order No. 500, and in any event we have already held the policy statement by itself unripe for review. AGA, 888 F.2d at 152
 
 
 [4]
 In actual fact, the tariffs characterized by the court as "cost of service" appear not to have fit its description. The only description of such a tariff in the Commission brief is of the PGA system involved in Transwestern, under which the customer pays in one period a rate fixed for that period, with discrepancies corrected by adjustments in a later period's charge per unit. See Commission Brief at 30-31 in Public Service Co. of New Hampshire, 3076 Records & Briefs U.S. Court of Appeals (D.C.)
 
 
 [5]
 The rule of Electrical District also does not apply when the refund provisions of Sec. 4 of the Natural Gas Act are triggered, or when the Commission commits a legal error that unlawfully delays the time as of which it establishes a corrected rate under Sec. 5, 15 U.S.C. Sec. 717d. See Office of Consumers' Counsel v. FERC, 826 F.2d 1136, 1138-39 (D.C.Cir.1987); Tennessee Valley Mun. Gas Ass'n v. FPC, 470 F.2d 446, 452-53 (D.C.Cir.1972); see also United Gas Improvement Co. v. Callery Properties, Inc., 382 U.S. 223, 229-30, 86 S.Ct. 360, 364-65, 15 L.Ed.2d 284 (1965) (upholding Commission decision to order refunds on rates where original Commission approval under Sec. 7 of the Act was judicially found unlawful). In Office of Consumers' Counsel, for example, the court held that where the Commission found practices unlawful under Sec. 5 but wrongly denied relief, new rates prescribed as a result of court correction of the error could be effective as of the date of the Commission's finding of unlawfulness. No one suggests that these exceptions relating to correction of Commission error are applicable here
 
 
 [6]
 Conversely, any new customer can reap the benefit of an overcharge in a previous period even though the customer in no way contributed to the surplus. 37 FERC at 61,914 n. 8
 
 
 [7]
 As a last stand, FERC argues that its power to waive the thirty-day notice requirement under Sec. 4(d) of the Natural Gas Act somehow translates into a power to waive the filed rate doctrine altogether. See Transwestern Pipeline Co., 44 FERC p 61,164 at 61,537 (1988) (order on rehearing). Given our conclusion that the filed rate doctrine is no bar to Transwestern's collection of unrecovered purchased gas costs incurred after May 11, 1988, this argument only applies to costs in Account No. 191 which were incurred prior to that date. Whatever remaining life this claim might otherwise have here, it was recently rejected by another panel of this circuit. See Columbia Gas Transmission Corp. v. FERC, 895 F.2d 791 (D.C.Cir.1990)
 
 
 [8]
 Transwestern does not claim that the Commission's decision to redocket the Sec. 4 filing prejudiced it with respect to its collection of the remaining Account No. 191 balance