988 F.2d 154
 300 U.S.App.D.C. 206, 140 P.U.R.4th 528,
Util. L. Rep. P 13,929
 PUBLIC UTILITIES COMMISSION OF the STATE OF CALIFORNIA, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
The Kansas Power and Light Company; Pacific Gas and
Electric Company; Transwestern Pipeline Company; Southern
California Gas Company; Texaco Inc., Texas Gas Marketing
Inc., and Texaco Exploration and Production, Inc.; Williams
Natural Gas Company, Intervenors.
SOUTHERN CALIFORNIA GAS COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
The Kansas Power and Light Company; Pacific Gas and
Electric Company; the Public Utilities Commission of the
State of California; Transwestern Pipeline Company;
Williams Natural Gas Company, Intervenors.
 Nos. 91-1372, 91-1422.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 2, 1993.
Decided March 19, 1993.
 
 [300 U.S.App.D.C. 208] Petition for Review of an Order of the Federal Energy Regulatory Commission.
 Arocles Aguilar and Michael A. Cartelli, Los Angeles, CA, with whom Edward W. O'Neill, Harvey Y. Morris, San Francisco, CA, and Woodrow D. Smith, Los Angeles, CA, were on the brief, for petitioners.
 Joel M. Cockrell, Atty., F.E.R.C., with whom William S. Scherman, Gen. Counsel, Jerome M. Feit, Washington, DC, Sol., and Joseph S. Davies, Bethesda, MD, Deputy Sol., F.E.R.C., were on the brief, for respondent.
 
 
 1
 William J. Grealis, Washington, DC, for intervenor Transwestern Pipeline Company.
 
 
 2
 Merek E. Lipson, Patrick G. Golden, and David W. Anderson, San Francisco, CA, were on the brief for intervenor Pacific Gas and Elec. Co.
 
 
 3
 John P. Beall, Houston, TX, entered an appearance for intervenors Texaco, Inc., Texaco Gas Marketing Inc., and Texaco Exploration and Production Inc.
 
 
 4
 Douglas O. Waikart, Washington, DC, entered an appearance for intervenor Williams Natural Gas Co.
 
 
 5
 Michael A. Cartelli and Woodrow D. Smith, Los Angeles, CA, entered an appearance for intervenor Southern California Gas Co.
 
 
 6
 Before: WALD, RUTH BADER GINSBURG and SILBERMAN, Circuit Judges.
 
 
 7
 Opinion for the Court filed by Circuit Judge WALD.
 
 WALD, Circuit Judge:
 
 8
 As the Federal Energy Regulatory Commission ("FERC" or "Commission") attempts to make take-or-pay problems a thing of the past, the transition to other systems has presented its own genre of problems. This case illustrates one such problem. In simple terms, FERC issued an order providing two basic ways in which pipelines could (1) recover outstanding take-or-pay costs and (2) bill their sales customers for the cost of maintaining a future inventory of natural gas for those customers. Order No. 500, Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol, 52 Fed.Reg. 30,334 (1987) ("Order No. 500"). Significantly, Order No. 500 imposed an early sunset date on one of its recovery mechanisms, giving the pipelines only a narrow window of opportunity in which to file tariffs implementing this mechanism, commonly referred to as the "equitable sharing" or "alternative recovery mechanism." Equally significantly, Transwestern Pipeline Company ("Transwestern") filed its Order No. 500 tariff sheets after this sunset date had passed; accordingly, it sought recovery only under the other, still available method of recovery, called a "gas inventory charge" or "GIC". Under the GIC, it could impose take-or-pay charges on its sales customers, but not on its transportation customers. FERC accepted Transwestern's GIC proposal, subject to two conditions discussed below. Transwestern Gas Pipeline Co., 43 F.E.R.C. p 61,240 (1988) ("GIC Order") aff'd in part and remanded in part, Transwestern Pipeline Co. v. FERC, 897 F.2d 570 (D.C.Cir.), cert. denied sub nom. Transwestern Pipeline Co. v. Kansas Power & Light Co., 498 U.S. 952, 111 S.Ct. 373, 112 L.Ed.2d 335 (1990) ("Transwestern"); 42 F.E.R.C. p 61,164 (1988).
 
 
 9
 Almost immediately, Transwestern lost its last sales customers, including petitioner Southern California Gas Company ("SoCal"), a natural gas distributor. SoCal, in reliance on Transwestern's decision to recover take-or-pay costs from its sales customers, [300 U.S.App.D.C. 209] decided to use Transwestern only for transportation and contracted to buy its gas elsewhere. Shortly thereafter, this court ruled that the sunset date of Order No. 500 was unlawful, and that FERC should reopen the filing period for the alternative recovery mechanism. American Gas Ass'n v. FERC, 888 F.2d 136 (D.C.Cir.1989) (AGA I ). Transwestern then filed tariffs implementing this mechanism, which also would impose accumulated take-or-pay charges on its transportation customers, including SoCal. FERC permitted Transwestern to abandon its GIC certificate and recover take-or-pay charges under the alternative recovery mechanism. Transwestern Pipeline Co., 55 F.E.R.C. p 61,157 (Apr. 30, 1991) ("Order Abandoning GIC"). Petitioners SoCal and the Public Utilities Commission of California ("CPUC"), which represents the interests of SoCal's ratepayers, sought rehearing of this order, which FERC denied. Transwestern Pipeline Co., 56 F.E.R.C. p 61,203 (Aug. 2, 1991) ("Order Denying Rehearing"). Petitioners seek review of this decision.
 
 
 10
 Both Transwestern and petitioners present compelling claims. Transwestern argues that it should not bear the burden of FERC's error in attaching an unlawful sunset date to one method of recovery. Petitioners argue that Transwestern's initial decision to impose charges on sales customers was not compelled by FERC but was simply a bad business decision for which Transwestern, and not its customers or the ratepayers, should bear the risk. CPUC further argues that the charges that FERC now seeks to impose on it violate the rule against retroactive ratemaking and the filed rate doctrine. FERC considered and weighed these arguments, then decided that, on balance, the better course would be to allow Transwestern to change its method of recovery. Because we find that this decision was within the agency's discretion, and did not violate either the rule against retroactive ratemaking or the filed rate doctrine, we affirm FERC's order.
 
 I. GENERAL BACKGROUND
 
 11
 This dispute is the outgrowth of FERC's recent efforts to encourage increased competition in natural gas. A cornerstone of this effort has been the "unbundling" of the sale of gas from its transportation, which permits customers the choice of buying gas from the pipeline or buying it in the field and transporting it on interstate pipelines. See Order No. 436, Regulation of Natural Gas Pipelines after Partial Wellhead Decontrol, 50 Fed.Reg. 42,408 (1985). Many pipelines, including Transwestern, have accordingly converted to "open access" pipelines serving both sales and transportation customers, and accepting for shipment gas sold in competition with their own.
 
 
 12
 While ultimately beneficial for consumers, the transition to open access has created problems for the pipelines, not the least of which is recovery of take-or-pay costs. Take-or-pay costs are incurred when a pipeline, in order to maintain inventories for its sales customers, enters into a contract with the producer in which it promises either to take or to pay for the gas it has contracted to buy. Pipelines that have built up such inventories find them hard to sell once they have granted access to the pipeline to carry the gas of their competitors; as a result, they are hit with billions of dollars of costs. When Order No. 436 came before this court for review, we found most aspects of it proper, but held that the Commission had failed to engage in reasoned decisionmaking as to the order's impact on pipelines' take-or-pay liability. Because this aspect of the order was inseparable from the rest of the open access scheme, we vacated and remanded with instructions to address the take-or-pay problems. Associated Gas Distribs. v. FERC, 824 F.2d 981 (D.C.Cir.1987) ("AGD I "), cert. denied sub nom. Interstate Natural Gas Ass'n v. FERC, 485 U.S. 1006, 108 S.Ct. 1468, 99 L.Ed.2d 698 (1988). In response to our mandate in AGD I, the Commission implemented an interim order, Order No. 500, which provided means by which the pipelines could both shift some of their accrued take-or-pay costs onto producers and consumers and avoid the recurrence of such problems in the future.
 
 
 13
 [300 U.S.App.D.C. 210] This case involves two such methods. The first is the "acceptable passthrough mechanism" established in Order No. 500 and Order No. 528, 53 F.E.R.C. p 61,163 (1990).[1] This mechanism was designed to permit a pipeline to resolve its accumulated take-or-pay liability before becoming an open-access pipeline. Under Order No. 500, a pipeline had two choices. First, it could recover, as before, all of its prudently incurred costs through the traditional sales commodity provision of its tariff. Second, it could institute an "equitable sharing mechanism," which permitted it to recover 25% to 50% of its take-or-pay "buyout or buydown" costs through a fixed charge on its sales customers if it agreed to "absorb" an equal percentage. After this court struck down certain aspects[2] of this "equitable sharing mechanism" as violating the filed rate doctrine, Associated Gas Distribs. v. FERC, 893 F.2d 349, 354-57 (D.C.Cir.1989), cert. denied sub nom. Berkshire Gas Co. v. Associated Gas Distribs., 498 U.S. 907, 111 S.Ct. 277, 112 L.Ed.2d 232 (1990) ("AGD II "), FERC issued Order No. 528. Order No. 528 also permits an "alternative" recovery under which pipelines absorb part of the outstanding take-or-pay liability, but one whereby the remainder is recovered through forward-looking volumetric surcharges on sales and transportation, or total throughput. Charges imposed under this "alternative mechanism" continue to be known as Order No. 500 charges.
 
 
 14
 The second method at issue here, the "gas inventory charge" or GIC, complements the first. While Order No. 500 recovery is aimed at wiping out existing take-or-pay liability for converting pipelines, the GIC is forward-looking, aimed at preventing the recurrence of take-or-pay problems. Under a GIC pricing structure, a pipeline sets two separate charges for its sales customers. The first is the commodity charge, which is based on the purchase price of the gas; the second is the GIC, which reflects the pipeline's costs of maintaining an inventory of contract rights to purchase gas to meet its customers' nominations. See GIC Order, 43 F.E.R.C. at 61,648; Transwestern, 897 F.2d at 574. Similar to liquidated damages, the GIC is a charge the customer pays on each unit of gas that it nominates but does not take.[3]
 
 
 15
 It is clear that FERC intended for pipelines to negotiate settlements of existing take-or-pay liability and enter into Order No. 500 agreements before accepting GICs. Order Abandoning GIC, 55 F.E.R.C. at 61,510. By accepting a GIC, a pipeline waives the right to use other methods of recovering any costs accruing later. AGA I, 888 F.2d at 144. Significantly, while the GIC applies only to sales customers, the Order No. 500 charges can be imposed on transportation customers, as well. See K N Energy, Inc. v. FERC, 968 F.2d 1295 (D.C.Cir.1992).
 
 II. PROCEDURAL BACKGROUND
 
 16
 On May 11, 1988, FERC issued an order granting Transwestern a GIC certificate. Transwestern, 43 F.E.R.C. p 61,240. The certificate had two conditions: the pipeline could impose no exit fee on any customer that "nominated zero volumes," or elected to buy no gas, and it could recover no take-or-pay costs other than through the GIC. This latter condition, known as the "exclusivity condition," specifically prohibited Transwestern from "recover[ing] take-or[300 U.S.App.D.C. 211] pay prepayment, buyout or buydown costs incurred after the date this certificate is accepted other than through the GIC mechanism." Id. at 61,658 (emphasis added). Already accumulated take-or-pay costs, or "costs that have already been paid or which are known and measurable through reference to binding written agreements entered into before acceptance of the GIC," Transwestern Pipeline Company, 44 F.E.R.C. p 61,164, at 61,535 (1988), were recoverable (at least until the sunset date) under the Order No. 500 mechanism. Thereafter, the pipeline was not precluded from including accrued take-or-pay liability in its GIC charge. After receiving a number of extensions, Transwestern accepted its GIC certificate on June 30, 1989, proposing an effective date of October 1, 1989. Its traditional recovery mechanism, the "purchased gas adjustment" or PGA,[4] expired the day its GIC became effective.
 
 
 17
 As it happened, Transwestern's two largest customers, SoCal and Williams, elected zero nominations,[5] and under the terms of its GIC certificate, Transwestern was not allowed to impose exit fees on them. Moreover, since they were no longer sales customers, Transwestern could not charge them a GIC. Finding itself unable to recover any of its take-or-pay charges, Transwestern petitioned FERC for relief. It sought first to impose Order No. 500 charges, its exclusivity condition notwithstanding, then to abandon the exclusivity condition itself. See Order Denying Rehearing, 56 F.E.R.C. at 61,823. It also expressed a desire to abandon its GIC altogether, but refrained from doing so pending FERC's response to its request to impose Order No. 500 charges. On February 28, 1991, Transwestern filed tariff sheets proposing a recovery of take-or-pay liability through either a combination of direct charge and volumetric surcharge or through a surcharge alone.
 
 
 18
 FERC initially denied Transwestern's Order No. 500 filings as inconsistent with the GIC's exclusivity condition. Transwestern Pipeline Co., 52 F.E.R.C. p 61,100 (1990); Transwestern Pipeline Co., 52 F.E.R.C. p 61,342 (1990). FERC reexamined its position, however, in the wake of two decisions by this court. First, in AGA I, 888 F.2d at 151, we invalidated as arbitrary and capricious Order No. 500's sunset provision, which required that pipelines negotiate passthrough mechanism recoveries by March 31, 1989, and we directed the Commission to accept applications for such recoveries at least until the court had reviewed FERC's response to the AGA I decision. AGA I thus breathed new life into the passthrough mechanism that had expired before Transwestern filed its GIC certificate. Second, in Transwestern, 897 F.2d at 582, we indicated that Transwestern was free to propose methods of recovery that did not conform to its exclusivity condition. FERC relied on these two opinions to hold that, under "the unique conditions of Transwestern's acceptance of the GIC while the sunset date was still in effect," it would be "error to continue to hold Transwestern" to its exclusivity condition. Order Abandoning GIC, 55 F.E.R.C. at 61,510. FERC therefore eliminated this condition retroactive to October 1, 1989, the date the GIC certificate went into effect, permitting the pipeline to seek recovery for take-or-pay charges incurred while the GIC was in effect. FERC went on to conclude that "the public convenience and necessity permits prospective abandonment of the entire GIC certificate," and accordingly took that step. Id. Commissioner Moler dissented, noting the conflicting legitimate arguments [300 U.S.App.D.C. 212] on both sides and concluding that she "f[e]ll on the side of rejecting Transwestern's filing." Id. at 61,513.
 
 
 19
 SoCal and CPUC sought rehearing of this order, which the Commission denied, with Commissioner Moler again dissenting. Order Denying Rehearing, 56 F.E.R.C. p 61,203. This appeal followed.[6]
 
 III. ANALYSIS
 
 20
 CPUC challenges the FERC order denying rehearing primarily on four grounds. The first two, that permitting Transwestern to abandon the exclusivity condition violated the filed rate doctrine and that it violated the rule against retroactive ratemaking, are related. Third, CPUC argues that FERC committed legal error in concluding that prior decisions of this court compelled the agency to accept Transwestern's filing. Finally, it claims that FERC's order was not the result of reasoned decisionmaking. We address all four in turn.[7]
 
 A. Filed Rate Doctrine
 
 21
 The filed rate doctrine "forbids a regulated entity to charge rates for its services other than those properly filed with the appropriate federal regulatory authority." Arkansas Louisiana Gas Co. v. Hall, 453 U.S. 571, 577, 101 S.Ct. 2925, 2930, 69 L.Ed.2d 856 (1981). In other words, the doctrine bars the Commission from imposing after-the-fact increases, such as surcharges, on gas already purchased. Id. at 578, 101 S.Ct. at 2. The filed rate doctrine is not applicable here, as Transwestern's passthrough mechanism imposes a charge that is calculated prospectively on gas that is yet to be transported; it does not retroactively increase the surcharge on any gas that SoCal had previously purchased. Put another way, at any given moment, the rates on file for Transwestern's Order No. 500 charges are the rates that SoCal is charged: no more and no less.
 
 
 22
 This case is therefore distinguishable from AGD II, 893 F.2d at 353, in which we held that a pipeline's passthrough mechanism, which allocated take-or-pay costs according to a customer's past purchases, violated the filed rate doctrine. Rejecting FERC's argument that it was merely allocating current take-or-pay expenses in a fair and equitable fashion by using a customer's past purchases to allocate its share of these current expenses, we instructed that the relevant inquiry was to "identify the purchase decisions to which the costs are attached." Id.; accord Associated Gas Distribs. v. FERC, 898 F.2d 809, 810 (D.C.Cir.1990) (per curiam ) ("AGD III ") (Williams, J., concurring) ("we must ask to what a new proposed charge relates "). Under this inquiry, we disapproved the mechanism under which the Commission "apparently require[d] even customers who secure abandonment of service to pay their share under the passthrough as additional charges for past gas-purchasing decisions. This practice reinforces our conclusion that the Commission views these as additional charges for past gas-purchasing decisions." AGD II, 893 F.2d at 356 n. 1 (citation omitted) (emphases added). In this case, by contrast, Transwestern's passthrough mechanism is pegged to its customers' current decisions on pipeline throughput, not on their past decisions on purchases. That is, if SoCal had never purchased any gas from Transwestern, its liability for Order No. 500 charges would be unchanged. This negates any contention [300 U.S.App.D.C. 213] that the charges are based on past purchases. Moreover, this conclusion is consistent with K N Energy, 968 F.2d at 1301, in which we upheld a pipeline's recovery of take-or-pay costs through a volumetric surcharge on total throughput for a forward-looking period.
 
 B. Rule Against Retroactive Ratemaking
 
 23
 More problematic is CPUC's claim that FERC's order violates the rule against retroactive ratemaking, which "derive[s] from the filed rate doctrine." Southern California Edison Co. v. FERC, 805 F.2d 1068, 1070 n. 2 (D.C.Cir.1986) (citing City of Piqua v. FERC, 610 F.2d 950, 954 (D.C.Cir.1979)). "[T]he rule against retroactive ratemaking prevents utilities from collecting revenues to compensate for [prior over- or] underrecoveries...." Id. (citing Public Serv. Co. of New Hampshire v. FERC, 600 F.2d 944, 956-61 (D.C.Cir.), cert. denied, 444 U.S. 990, 100 S.Ct. 520, 62 L.Ed.2d 419 (1979)). That is, even charges that are imposed prospectively, and therefore satisfy the filed rate doctrine, are improper if they are based on the pipeline's losses in a prior period.
 
 
 24
 CPUC argues that the passthrough charges at issue here merely compensate Transwestern for its underrecoveries under the GIC. It argues that, had Transwestern recovered its take-or-pay losses under the GIC, it would have no need to seek Order No. 500 recovery today. Logically, this argument is true. Moreover, it is not satisfactorily rebutted by the Commission's claim that there is no retroactivity problem in part because "[t]he subject take-or-pay costs are current costs...." This entirely misses the point. It is true that the Commission has determined that when a pipeline converts to open access, its take-or-pay settlement charges accumulated at that point are to be treated as current, not past charges:
 
 
 25
 Recovery of take-or-pay settlement costs is not barred by the filed rate doctrine or the prohibition against retroactive ratemaking. To the extent that such costs were incurred to terminate or reform gas purchase contracts, they are presently incurred costs that relate to current or future service, not past service. To the extent costs are incurred to extinguish take-or-pay liabilities that accrued in the past, they are nonetheless current costs.... Pipelines were permitted to capitalize such payments and receive carrying charges on them, but not to recover the principle through current rates. Only when the pipelines began making take-or-pay settlement payments to producers did such liabilities become a current cost eligible for recovery through rates.
 
 
 26
 Order No. 528-A, 54 F.E.R.C. p 61,095, at 61,305-06 (1991). That reference, however, means only that, as of the moment that Transwestern settled various take-or-pay costs, those costs became current, and were not to be treated as costs accrued in a past period. It does not settle the basic issue here, which is whether these same take-or-pay settlement costs that were built into,[8] but not collected under, the GIC must be treated as underrecoveries from the GIC period.
 
 
 27
 If this case involved no other factual or legal considerations, CPUC would have a strong claim, as it is " 'a cardinal principal of ratemaking that a utility may not set rates to recoup past losses, nor may the Commission prescribe rates on that principle.' " Southern California Edison Co., 805 F.2d at 1070 n. 2 (quoting Nader v. FCC, 520 F.2d 182, 202 (D.C.Cir.1975)). This case involves three important factors, however, which in combination lead us to conclude that FERC's order permitting the passthrough charges does not violate the rule against retroactive ratemaking. First, and most important, Transwestern's decision to adopt the GIC, along with its exclusivity condition, was based on a FERC order that we later determined was unlawful. Second, Transwestern's immediate challenge to the exclusivity condition, as well as the pipelines' judicial challenge to the [300 U.S.App.D.C. 214] sunset date, put SoCal and CPUC on notice that the conditions of Transwestern's GIC might be subject to change. The third factor, that FERC's order was based on its reasonable interpretation of our case law and the independent exercise of its discretion, is discussed in the next section, in response to the petitioners' charge that FERC's interpretation of these cases constituted legal error.
 
 1. Overturned Order
 
 28
 As discussed above, Order No. 500, in order to encourage early settlements, made the passthrough alternative subject to a December 31, 1988 filing deadline, which was later extended to March 31, 1989. Order 500-F, 53 Fed.Reg. 50,924 (1988), reh'g denied, Order No. 500-G, 54 Fed.Reg. 7400 (1989). In AGA I, 888 F.2d at 147, we concluded that "[b]y promulgating a sunset provision that has forced rapid settlements under a regime of uncertain validity," FERC had violated this court's mandate to engage in reasoned decisionmaking. The sunset provision was therefore deemed arbitrary and capricious. Id. at 151. We directed the Commission not to impose any deadline on applications for the passthrough mechanism "at least until there has been judicial review of the explanation it issues in response to this decision." Id. at 151.
 
 
 29
 Transwestern accepted its GIC after the March 31, 1989 sunset provision took effect, but before we issued our AGA I decision overturning it. Transwestern argues, therefore, that because it accepted the GIC in reliance on an unlawful FERC order, it should be permitted to file for a modification or abandonment. We agree.
 
 
 30
 This court has previously recognized FERC's authority to order retroactive rate adjustments when its earlier order disallowing a rate is reversed on appeal. Natural Gas Clearinghouse v. FERC, 965 F.2d 1066, 1074 (D.C.Cir.1992) (per curiam ) (citing Indiana & Michigan Elec. Co. v. FPC, 502 F.2d 336, 339 n. 8 (D.C.Cir.1974), cert. denied, 420 U.S. 946, 95 S.Ct. 1326, 43 L.Ed.2d 424 (1975)) ("Clearinghouse "). Clearinghouse involved a FERC order interpreting whether a section of the Natural Gas Act dealing with periodic rate adjustments called for the periodic adjustment of depreciation expenses. FERC's initial order, which said that the statutory provision did not apply to depreciation, was reversed by this court because of FERC's failure to engage in reasoned decisionmaking. Tarpon Transmission Co. v. FERC, 860 F.2d 439, 444 (D.C.Cir.1988). On remand, FERC adopted a different view, concluding that the statute did extend to depreciation expenses. It then ordered that its new interpretation be applied retroactively, permitting Tarpon, the pipeline company, to bill its shippers for "recoupment" payments. The Clearinghouse petitioners were shippers who objected to being billed this retroactive payment for gas shipped--and priced--under FERC's initial order. We denied their petition, finding nothing in the Natural Gas Act to conflict with the "general principle of agency authority to implement judicial reversals." Clearinghouse, 965 F.2d at 1073 (citing United Gas Improvement Co. v. Callery Properties, Inc., 382 U.S. 223, 229, 86 S.Ct. 360, 364, 15 L.Ed.2d 284 (1965)). We then reaffirmed FERC's "retroactive corrective authority," id. at 1074 n. 14, referring to cases in which FERC had "invoked its remedial authority to impose retroactive surcharges upon purchasers of pipeline transport service in order to allow the pipeline to collect a rate that was erroneously disallowed by the Commission." Id. at 1074 (citing Sea Robin Pipeline Co., 48 F.E.R.C. p 61,335 (1989); Texas Eastern Transmission Corp., 25 F.E.R.C. p 61,469 (1983)).
 
 
 31
 There are obvious similarities between the two cases. In both, FERC, in response to a judicial reversal, modified its position and granted retroactive relief to a party (in each case, a pipeline) affected by its earlier order. In both, petitioners are customers of the pipeline that suffered a loss as a result of an overturned FERC order. In Clearinghouse, we concluded that "[t]he Commission's decision on remand to adopt Tarpon's interpretation ... logically affects its prior decision not to approve Tarpon's significantly higher open-access rate based on the cost of service determined [300 U.S.App.D.C. 215] under the old interpretation...." Clearinghouse, 965 F.2d at 1074 (emphasis added). Here, we conclude that the then-existing sunset provision "logically affected" Transwestern's decision to accept a GIC certificate with an exclusivity condition. Therefore, the Commission's remedial authority that permitted a retroactive adjustment in Clearinghouse should similarly support the retroactive abandonment of the exclusivity condition.
 
 
 32
 If anything, some aspects of this case make it a stronger candidate than Clearinghouse for FERC's exercise of its remedial authority. The initial Clearinghouse order was reversed only for a lack of reasoned decisionmaking, with no decision on the substantive merits of the order, and therefore no suggestion of a need, beyond providing reasoning, for the agency to "undo ... what [was] wrongfully done by virtue of its [prior] order." Callery, 382 U.S. at 229, 86 S.Ct. at 364. In this case, by contrast, we vacated the sunset provision as arbitrary and capricious and potentially "prejudicial" to the pipelines, which at least suggested to the agency that actions taken and orders issued in reliance on that provision might be good candidates for "undoing."
 
 
 33
 Moreover, we find no material distinctions between this case and Clearinghouse. Petitioners argue that no FERC order compelled Transwestern to accept the GIC, that the pipeline acted voluntarily and therefore cannot plead reliance on the illegal order. This is an overly narrow definition of reliance. We believe it sufficient if the illegal order induced, even if it did not compel, Transwestern to accept the GIC when it did. The Commission clearly believed that this was the case:
 
 
 34
 If the March 31, 1989 sunset date had not ended the availability of another mechanism for Transwestern to recover its take-or-pay costs, Transwestern might not have accepted its GIC certificate when it did, but might have continued to resolve its old take-or-pay contracts under the Order No. 500 mechanism before accepting its GIC certificate. Thus it appears that Transwestern's current predicament may be the direct result of the Commission's legal error of imposing an early sunset date on the Order No. 500 recovery mechanism.
 
 
 35
 Order Abandoning GIC, 55 F.E.R.C. at 61,150. We decline to take issue either with this conclusion or with FERC's determination that these "unique circumstances" warranted a remedy for Transwestern.
 
 
 36
 Nor do we think FERC's remedial authority is misused because its response to the court's invalidation of one order, Order No. 500, is to permit the pipeline to abandon another order, its GIC Order, which itself has never been declared illegal. As a practical matter, the most obvious way to remedy the judicial reversal of the sunset provision is to receive applications from pipelines that accepted their GIC certificates--and eschewed Order No. 500 recoveries--while the sunset provision was in effect. We have no inclination, even if we had the authority, to say that this approach exceeded the Commission's remedial authority, particularly since agency discretion "is often at its 'zenith' when the challenged action relates to the fashioning of remedies." Towns of Concord v. FERC, 955 F.2d 67, 76 (D.C.Cir.1992) (quoting Niagara Mohawk Power Corp. v. FPC, 379 F.2d 153, 159 (D.C.Cir.1967)); see also Southern California Edison, 805 F.2d at 1071 (relying on Commission's wide discretion and latitude to order remedy). As we stated in Clearinghouse, 965 F.2d at 1074, "[i]f the FERC were prohibited from ordering recoupment of losses caused by its error[s] ..., the pipeline's primary right under the NGA to propose and collect a justified rate would be drastically curtailed." Moreover, "without such corrective power, pipelines would be substantially and irreparably injured by FERC errors, and judicial review would be powerless to protect them from much of the losses so incurred." Id. at 1074-75.
 
 2. Notice
 
 37
 Predictability is an underlying purpose of both the filed rate doctrine and the rule against retroactive ratemaking. Towns of Concord, 955 F.2d at 75; Public Utilities Comm'n of California v. FERC, [300 U.S.App.D.C. 216] 894 F.2d 1372, 1383 (D.C.Cir.1990) (citing Columbia Gas Transmission Co. v. FERC, 831 F.2d 1135, 1141 (D.C.Cir.1987) ("Columbia Gas I ")). These doctrines are designed to allow "purchasers of gas to know the consequences of purchasing decisions they make." Towns of Concord, 955 F.2d at 75; Transwestern, 897 F.2d at 577 (citations omitted); accord AGD III, 898 F.2d at 810 (Williams, J., concurring). Accordingly, when determining whether a FERC order violates either the filed rate doctrine or the rule against retroactive ratemaking,[9] this court inquires whether, as a practical matter, the purchasers of the gas--such as petitioners here--had sufficient notice that the approved rate was subject to change. "It is not that notice relieves the Commission of the bar on retroactive ratemaking, but that it 'changes what would be purely retroactive ratemaking into a functionally prospective process by placing the relevant audience on notice at the outset that the rates being promulgated are provisional only and subject to later revision.' " Clearinghouse, 965 F.2d at 1075 (quoting Columbia Gas Transmission Co. v. FERC, 895 F.2d 791, 797 (D.C.Cir.), cert. denied sub nom. Panhandle Eastern Pipe Line Co. v. Columbia Gas Transmission Co., 498 U.S. 907, 111 S.Ct. 278, 112 L.Ed.2d 233 (1990) ("Columbia Gas II ")).
 
 
 38
 FERC itself relied on these notice principles in denying the petition for rehearing. The Commission concluded that there was no violation of the filed rate doctrine or the retroactive rulemaking bar because SoCal had sufficient notice
 
 
 39
 that the exclusivity condition might not permanently prevent Transwestern from filing to recover take-or-pay costs through a mechanism other than its GIC. Transwestern had sought rehearing of and appealed the GIC exclusivity condition and SoCal was aware that the condition might not stand. In fact, when the condition was reviewed on appeal in Transwestern v. FERC, the court found that it was not permanent and did not bar take-or-pay filings by Transwestern.
 
 
 40
 Order Denying Rehearing, 56 F.E.R.C. p 61,203, at 61,824.
 
 
 41
 We are not as convinced as FERC that the notice afforded SoCal, standing alone, would be sufficient to obviate retroactivity concerns. The notice provided here, while not inconsequential, is more atmospheric than explicit; consequently, it is less substantial than the notice on which we have relied in our previous cases. Nonetheless, the events surrounding the initiation of the GIC cannot have failed to alert SoCal and others to the fact that the conditions of the GIC might not survive appeal. We are, therefore, comfortable in accepting its relevance as one of the "unique circumstances" that influenced FERC's decision in this case.
 
 
 42
 Clearinghouse involves perhaps the clearest case of notice. The tariff at issue in Clearinghouse expressly reserved the right to seek a surcharge to make the company whole in the event that another FERC opinion was overturned. Clearinghouse, 965 F.2d at 1075. Moreover, the Commission adopted this reservation, accepting the filings "subject to" the pending rate challenge. See id. Finally, this court thought it relevant to the issue of the purchasers' notice that similar surcharges had previously been used in similar circumstances to make a pipeline company whole. Id. at 1076-77. We noted that the filed rate doctrine "simply does not extend to cases in which buyers are on adequate notice that resolution of some specific issue may cause a later adjustment to the rate being collected at the time." Id. at 1075.
 
 
 43
 In this case, unlike Clearinghouse, the notice of possible future additional charges for take-or-pay liability was not explicit. We believe, nonetheless, that the circumstances surrounding the installation of the GIC were adequate to alert petitioners that there might be a later adjustment, specifically a passthrough charge, in Transwestern's [300 U.S.App.D.C. 217] rates. In the first place, Transwestern and several other pipelines had mounted a court challenge to the sunset provision in AGA I. Second, when Transwestern accepted the GIC, it simultaneously asked FERC to remove the exclusivity condition. Finally, petitioners had to have been aware that FERC had previously and frequently approved passthrough mechanisms as a means to recover remaining take-or-pay charges, and that we had endorsed FERC's "cost-spreading" efforts, making clear that "[a]ll actors in the natural gas industry" were "proper candidates for absorbing take-or-pay liability." AGD I, 824 F.2d at 1021 (emphasis added). Even more to the point, we had explicitly acknowledged and invited FERC to address the danger that "pipelines might be unable to recover their costs solely from sales customers who, under an open access regime, can readily switch to other suppliers." K N Energy, 968 F.2d at 1301 (citing AGD I, 824 F.2d at 1021)--precisely what happened here.
 
 
 44
 In Clearinghouse, of course, FERC's own order indicated that the rate was provisional, while in the present case, it was primarily the pipeline's actions that provided the requisite notice. We determined, however, in Consolidated Edison v. FERC, 958 F.2d 429 (D.C.Cir.1992) ("ConEd "), that such notice from FERC is not always required. In ConEd, the pipeline filed a request on November 30, 1990 for a rate change and proposed that it become effective December 1, the very next day. On December 27, FERC granted the rate increase and made it retroactive to December 1. The pipeline's purchasers argued that FERC's approval of the retroactive rate increase violated the filed rate doctrine. We disagreed, concluding that the customers had due notice from two sources: the pipeline's filing requesting a retroactive effective date, and FERC's record of granting such requests. Id. at 434-35. Significantly, we found the notice sufficient even though petitioners did not know either that FERC would grant the increase or that it would make it retroactive. Id. at 434.[10] Petitioners in this case were similarly situated: they had notice both of the pipeline's intent to effect a rate change, and of FERC's record of applying the filed rate doctrine and the prohibition on retroactivity in such a way as to permit pipelines to recover reasonable take-or-pay costs.
 
 
 45
 Columbia Gas I is not to the contrary. Columbia Gas I involved the adequacy of FERC's notice to the pipelines' customers that they might be liable for some of the producers' "deferred costs." In 1980, the Commission had published an order informing the gas producers, as the "first sellers" of gas, that it intended to allow them to pass certain production costs along to their pipeline customers, their "first purchasers." Because the agency had not completed rulemaking to establish an appropriate allowance for these costs, it deferred accepting applications for the recovery of these costs, but assured the producers that the new regulations would allow retroactive recovery from the date of the 1980 order. Columbia Gas I, 831 F.2d at 1138. When the new rules were issued in 1983, FERC issued orders permitting a number of the "first purchasers," the pipelines, to direct bill their customers, the "downstream purchasers," for their share of these deferred expenses. Id. at 1139. We struck these orders, rejecting the Commission's argument that its 1980 order "put everyone on notice" that these costs would be retroactive. Id. at 1140. We concluded, instead, that the notice, which was directed only to first purchasers of natural gas, was limited to "a highly restricted audience," which did not include the downstream purchasers. Id. at 1140-41. In the present case, by contrast, Transwestern's petition for rehearing on the exclusivity condition and its judicial appeal of the sunset provision provided notice directed to its customers, [300 U.S.App.D.C. 218] including SoCal, that its current take-or-pay recovery regime was subject to change.[11]
 
 
 46
 The fact of notice also distinguishes this case from Public Utilities Commission of California v. FERC, 894 F.2d 1372, 1383 (D.C.Cir.1990) ("CPUC "), in which we invoked "predictability" in refusing to engage in "post hoc tinkering" with rates. Although there are parallels in the two cases, CPUC did not present any suggestion that the rates at issue had been subject to change or that petitioners were on notice of a potential change. Instead, that case dealt solely with rates that had been finally approved and collected. Nor could the parties seeking relief in CPUC claim that their dilemma was in any way attributable to a FERC error. Finally, we find these cases distinguishable by the presence of take-or-pay charges in this case. FERC, with the backing of this court, has been at pains to permit pipelines to recover these costs, which have accumulated less through mismanagement or miscalculation by the pipelines than through an otherwise beneficial transition to competitive gas markets. See Order No. 500, 52 Fed.Reg. at 30,337. Petitioners "w[ere] no doubt aware of FERC's long record, ... of doing exactly what [they] object[ ] to here": construing the doctrines of notice and retroactivity to permit the recovery of take-or-pay costs. ConEd, 958 F.2d at 435.
 
 
 47
 In conclusion, this is not a case in which "a customer had no way of knowing, when it made its decision to buy gas, that it would later incur a surcharge on that purchase." Town of Norwood v. FERC, 962 F.2d 20, 25 (D.C.Cir.1992). On the contrary, petitioners had notice, through Transwestern's filings and through FERC's record on take-or-pay charges, that the pipeline's GIC certificate conditions were subject to change.
 
 
 48
 C. FERC's Interpretation of This Court's Precedents
 
 
 49
 CPUC asserts that FERC's decision to allow the abandonment of the condition was based on the agency's misinterpretation of our prior decisions. Those decisions, argues CPUC, instructed only that Transwestern could "tender" future take-or-pay filings, not that FERC should approve them. There is no doubt that FERC's decision was based on our case law, as its order emphasized: "but for the court's opinion in Transwestern and AGA I, we would reject Transwestern's filing on the basis of the policy objectives originally underlying the exclusivity condition." Order Abandoning GIC, 55 F.E.R.C. at 61,150. We conclude, however, that the agency, while giving due consideration to the legal principles articulated in those cases, nonetheless exercised its own independent judgment as to the invocation of its remedial discretion, its disclaimer notwithstanding. That is, it quite properly read AGA I to instruct that the sunset provision was invalid and Transwestern to instruct that the Commission had the power to cancel the exclusivity clause. But it exercised its own expert judgment in determining that Transwestern's acceptance of the GIC was induced by the illegal sunset provision and that the appropriate response was the retroactive elimination of the exclusivity condition.
 
 
 50
 In Transwestern, we dismissed Transwestern's challenge to the exclusivity condition on the ground that it was not yet aggrieved. We first indicated that bars such as the exclusivity condition were not necessarily permanent. "The Commission insists that a certificate condition appearing to bar a utility from proposing, or itself from accepting, a specified type of rate, does not in fact do so in the absence of special circumstances." Transwestern, 897 F.2d at 581. We cited to Tennessee Gas Pipeline Co. v. FERC, 689 F.2d 212, 215 (D.C.Cir.1982), in which this court held that a certificate condition "d[id] not preclude [the pipelines] from filing proposed rates ... that treat the costs of their facilities differently than the Commission has stated that it intends to treat them." We [300 U.S.App.D.C. 219] then concluded that, "[e]ven if Transwestern could reasonably have read the [exclusivity] condition as binding," its potential loss was limited to "equitable sharing" recovery, which had since been invalidated. Transwestern, 897 F.2d at 582. Therefore, "[w]ith Transwestern free to make new, nonconforming proposals for recovery of take-or-pay costs of the type the Commission appeared to bar, we cannot find Transwestern aggrieved by the take-or-pay exclusivity provision...." Id. (emphasis added). FERC understandably found in our decision indications that it should permit Transwestern to file to abandon its exclusivity condition. Its order denying rehearing cited several: our reference to cases holding that a certificate was not a permanent bar to a rate filing; our statement that the condition barred recovery only under the equitable sharing mechanism, which had since been declared unlawful; our observation that exceptions to the filed rate doctrine could be made when necessary to correct the Commission's legal error; and finally, our statement that Transwestern was not aggrieved, but was free to offer new proposals. Order Denying Rehearing, 56 F.E.R.C. at 61,824.
 
 
 51
 FERC did not rely exclusively on its reading of Transwestern, however; it also referred to our decision in AGA I that the sunset provision was unlawful. The Commission then proceeded to make its own determination that "Transwestern's predicament may have directly resulted from [the Commission's own] legal error of imposing a March 31, 1989 sunset date for take-or-pay filings." Id. It reiterated: The fact that "Transwestern might not have accepted the GIC certificate when it did, if the sunset date had not left it without any other effective means to recover take-or-pay costs ... compelled [the Commission] to accept Transwestern's filing to recover take-or-pay costs." Id. And again: "We have only accepted Transwestern's filings because of the special circumstances of its situation, particularly the fact its acceptance of the GIC certificate may have directly resulted from the Commission's legal error concerning the sunset date." Id.
 
 
 52
 We, like CPUC, read our Transwestern decision to indicate that FERC should permit Transwestern to make nonconforming take-or-pay filings, not to instruct the Commission on how to rule on them. We conclude, however, that while the Commission apparently felt constrained by our decisions to receive Transwestern's filings in these dockets, it exercised its own judgment and discretion in disposing of those filings. We therefore reject CPUC's contention that FERC's order is not entitled to deference. Cf. Phillips Petroleum Co. v. FERC, 792 F.2d 1165, 1169 (D.C.Cir.1986); SEC v. Chenery Corp., 318 U.S. 80, 94, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943).
 
 D. Reasoned Decisionmaking
 
 53
 CPUC maintains that FERC's orders fail to reflect reasoned decisionmaking. In its brief, CPUC alleges a lack of the requisite reasoning behind FERC's determination that there were unique circumstances--primarily its own legal error--justifying its relief for Transwestern. At oral argument, counsel for CPUC elaborated that FERC's orders do not reflect the balancing of equities which FERC now claims underlies its decision. Although we are to defer to FERC's technical expertise in ratemaking disputes, Clearinghouse, 965 F.2d at 1070 (citing Southern California Edison Co., 805 F.2d at 1072), we "cannot accept an agency determination unless it is the result of reasoned and principled decisionmaking that can be ascertained from the record." Tarpon Transmission Co., 860 F.2d at 442. The record in this case, however, evidences sufficient agency reasoning.
 
 
 54
 First, as discussed above, we find ample reasoned support in FERC's orders both for the agency's conclusion that Transwestern might have acted in reliance on the sunset provision, and for the agency's conclusion that this reliance constituted a unique circumstance justifying the exercise of the agency's discretion. Second, the orders make clear that FERC did, in fact, balance the equities of this case in reaching its decision. The Commission acknowledged the force of CPUC's claims when it noted that the exclusivity condition was [300 U.S.App.D.C. 220] designed to "assure that Transwestern's customers would know the full cost consequences of their nominations in advance," Order Abandoning GIC, 55 F.E.R.C. at 61,509, and admonished that "[g]enerally, a pipeline that chooses to accept a market-based GIC and to take its chances in the market should not only benefit from the opportunities of the marketplace but should also bear the risks." Id. It balanced these considerations, however, against several relevant factors. We have already discussed the unlawfulness of the order in effect when Transwestern accepted its GIC certificate and SoCal's awareness of Transwestern's challenge to the exclusivity condition. The Commission also relied heavily on the fact that the unlawfully truncated period for negotiating Order No. 500 recovery frustrated the underlying intent of that order:
 
 
 55
 When Order No. 500 was first issued, the Commission contemplated that pipelines would negotiate the resolution of existing contracts and file for such costs under Order No. 500 before accepting their GIC certificates. However, the Commission's position presupposed that all this would be accomplished before the sunset date for Order No. 500 filings and thus that the avenue for Order No. 500 recovery would be open to pipelines--including Transwestern--until the time they accepted their GIC certificates. As it turned out, this was not the case.
 
 
 56
 Id. (emphasis added). Thus, the Commission saw its decision as conforming to the underlying purpose of Order No. 500, which clearly intended that pipelines like Transwestern be able to recover existing take-or-pay liabilities from sales customers like SoCal. Left uncorrected, the effect of the sunset provision, however, would have been to reverse this scheme, leaving the pipeline holding the bag and permitting the sales customers to escape any liability for the take-or-pay charges accumulated on its behalf and for its benefit. Put another way, in a regulatory scheme that expressly contemplated that pipelines would have two complementary take-or-pay recovery mechanisms--Order No. 500 recovery for accumulated charges and the GIC for forward-looking charges--Transwestern would be limited to the second mechanism, and therefore denied any means to recover its charges reasonably incurred under the prior regime. We have held, in a similar context, that when the Commission commits legal error, the proper remedy is one that puts the parties in the position they would have been in had the error not been made. Consumers' Counsel, State of Ohio v. FERC, 826 F.2d 1136, 1139 (D.C.Cir.1987) (per curiam ) (citing Tennessee Valley Mun. Gas Ass'n v. FPC, 470 F.2d 446 (D.C.Cir.1972)). That is precisely what FERC attempted here.
 
 
 57
 Moreover, we have previously deferred to FERC's balancing of the equities, recognizing that " 'the difficult problem of balancing competing equities and interests has been given by Congress to the Commission with full knowledge that this judgment requires a great deal of discretion.' " Gulf Power Co. v. FERC, 983 F.2d 1095, 1099 (D.C.Cir. Jan. 22, 1993), (quoting Columbia Gas Transmission v. FERC, 750 F.2d 105, 109 (D.C.Cir.1984)). We have acknowledged for example, that the " 'equitable aspects of refunding past rates are ... inextricably entwined with the [agency's] normal regulatory responsibility.' " Towns of Concord, 955 F.2d at 75-76 (quoting Moss v. Civil Aeronautics Board, 521 F.2d 298, 308-09 (D.C.Cir.1975), cert. denied, 424 U.S. 966, 96 S.Ct. 1460, 47 L.Ed.2d 732 (1976)). We find such equitable considerations at least as applicable to the Commission's resolution of take-or-pay problems.[12]
 
 
 58
 If Transwestern's shortfall were solely a direct consequence of its uncoerced decision to adopt the GIC, this case would be more like Southern California Edison Co., 805 F.2d at 1072, in which we noted that "[e]quity does not move in favor of one whose conduct or action has brought upon it misfortune or pecuniary loss." [300 U.S.App.D.C. 221] FERC concluded, however, and we agree, that the agency's unlawful order, and not solely Transwestern's own conduct, may have led to the pipeline's pecuniary loss. It was well within the Commission's discretion to conclude that this factor tipped the scales in Transwestern's favor.
 
 IV. CONCLUSION
 
 59
 Were this merely a case of Transwestern asking FERC to insulate it from the risks of its decisions in a market-based regulatory scheme, our disposition might well be different. We have noted that the interest of parties in "the finality of approved rates ... outweighs the value of being able to correct for decisions that in hindsight may appear unsound." CPUC, 894 F.2d at 1383. The unique circumstances of this case, however, justify FERC's departure from this general principle.
 
 
 60
 Moreover, our decision is informed by, and limited to, the particular context of take-or-pay charges. We have previously accepted FERC's position that the "extraordinary nature of" and "unusual circumstances surrounding the take-or-pay problem" that accompany the transformation of the pipeline industry necessitate and justify certain modifications of, or even limited departures from, traditional ratemaking principles and rationales. K N Energy, 968 F.2d at 1301. We also have explicitly acknowledged and invited FERC to address the danger that "pipelines might be unable to recover their costs solely from sales customers who, under an open access regime, can readily switch to other suppliers." Id. (citing AGD I, 824 F.2d at 1021). That, of course, is precisely what happened here.
 
 
 61
 The Commission's Order No. 500 recovery mechanisms were implemented largely in response to our decision in AGD I, in which we instructed it to devise solutions to these take-or-pay problems. In Order No. 500, the Commission found that "no one segment of the natural gas industry or particular circumstance appear[ed] wholly responsible" for the take-or-pay crisis, and that "all segments should shoulder some of the burden of resolving the problem." Order No. 500, 52 Fed.Reg. at 30,337. We find nothing in our own or FERC's precedents to indicate that this is anything other than an acceptable cost-spreading decision requiring those who benefit from the transition to a competitive natural gas market to absorb some of the costs.
 
 Accordingly, the petition for review is
 
 62
 Denied.
 
 
 
 [1]
 Order No. 500 has since been replaced by Order No. 528, but the latter order retained many provisions of the earlier one
 
 
 [2]
 Specifically, we invalidated the "purchase deficiency allocation" methodology, under which each customer's fixed charge was based on its deficiency of purchases during a past base period. AGD II, 893 F.2d at 355
 
 
 [3]
 Although FERC Counsel's response at oral argument to specific questions about when a sales customer would have to pay the GIC generated some confusion, see Transcript of Oral Argument at 33-35, we believe this confusion is dispelled by FERC's brief to this court, which explained the functioning of the GIC as follows: "Under the GIC, a pipeline's sales customer would nominate in advance the amount of gas it intended to buy from the pipeline for a specified period; if the customer failed to take all the gas it had nominated, the customer was required to pay the GIC charge for each unit of gas it did not take." Brief for Respondent at 2 (citation omitted)
 
 
 [4]
 A purchased gas adjustment is a mechanism enabling pipelines to recover their rising gas prices. Under a PGA, a pipeline projects its historical costs into the future. But after each six-month period, it calculates any difference (usually a shortfall), and adds it to the rates for the next six months. The difference between projection and experience is "Account No. 191" balance. With GIC certificates, PGAs and Account No. 191 became irrelevant, except as to the balance at the moment of transition. When Transwestern made its transition to the GIC certificate, FERC allowed it to recover its Account No. 191 underrecoveries through the direct billing of its customers remaining at that moment. GIC Order, 43 F.E.R.C. at 61,653
 
 
 [5]
 SoCal converted all of its firm sales commitments to firm transportation commitments by election on September 15, 1989. Williams left the system entirely as of February 1, 1989
 
 
 [6]
 Transwestern intervened and filed a brief in support of FERC. Pacific Gas and Electric Co., a firm transportation customer of Transwestern, intervened and filed a brief in support of CPUC and SoCal
 
 
 [7]
 Petitioners briefly raised a fifth claim, that FERC's actions were inconsistent with its policy on comparability of service, but this does not warrant full discussion here. The comparability of service principle provides that, when FERC is relying on market conditions to set reasonable rates, it must inquire whether each party to an agreement had sufficient bargaining power, which depends largely on whether the market offered that party other, comparable services. See Tejas Power Corp. v. FERC, 908 F.2d 998, 1004 (D.C.Cir.1990). In this case, however, the disputed charges were based on cost of service, not on market forces. In this context, we have consistently approved the use of "cost-causation" principles, which FERC has applied here. See K N Energy, 968 F.2d at 1301
 
 
 [8]
 Transwestern's calculation of the GIC reflected "the costs incurred to buy out take-or-pay exposure under existing contracts...." GIC Order, 43 F.E.R.C. at 61,648 n. 12
 
 
 [9]
 Although our prior cases have addressed the issue of notice primarily in relation to the filed rate doctrine, we find it similarly applicable in relation to the prohibition against retroactive rulemaking, which serves the same purposes. Indeed, the two often overlap. AGD III, 898 F.2d at 810 (Williams, J., concurring)
 
 
 [10]
 ConEd involved a separate issue of statutory notice, as the relevant provisions of the Natural Gas Act required thirty days' notice between the filing for and the effective date of such an increase, which could be shortened or dispensed with by FERC only "for good cause shown." ConEd, 958 F.2d at 431 (citing 15 U.S.C. § 717c(d)). We distinguished between this statutory notice, which could be dispensed with, and "actual notice," the "essential requirement of the filed rate doctrine." Id. at 434 (citing Columbia Gas II, 895 F.2d at 795-96)
 
 
 [11]
 Of course, the present case can also be distinguished from Columbia Gas I by the fact that the surcharge, while recovering past take-or-pay charges, is pegged to prospective transport, not past purchases
 
 
 [12]
 It bears repeating, however, that the Commission does not have the authority to ignore the law to achieve an equitable result. CPUC, 894 F.2d at 1383. Had we found that its actions violated the filed rate doctrine or the rule against retroactive ratemaking, we would not then invoke the Commission's assessment of the equities to overcome those violations