**WESTERN RESOURCES, INC., Petitioner**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

**Pacific Gas and Electric Company, et al., Intervenors.**

Nos. 93–1642, 94–1316.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 30, 1995.

Decided Dec. 22, 1995.

Martin J. Bregman, argued the cause and filed the briefs for petitioner.

Susan J. Court, Special Counsel, Federal Energy Regulatory Commission, with whom Jerome M. Feit, Solicitor, was on the brief, argued the cause for respondent. Joel M. Cockrell, Attorney, entered an appearance.

Steve Stojic, with whom Frank X. Kelly, Joseph R. Hartsoe, and Dianne H. Russo, for intervenor Transwestern Pipeline Company, Edward W. O'Neill and Arocles Aguilar, for intervenor Public Utilities Commission of the State of California, and Randall R. Morrow, for intervenor Southern California Gas Company, were on the brief, argued the cause for intervenors Transwestern Pipeline Company, et al. Sherrie N. Rutherford, Maria K. Pavlou and Martin J. Marz entered appearances for intervenor Transwestern Pipeline Company. David L. Huard entered an appearance for intervenor Southern California Gas Company.

Gregory Grade and John H. Cary entered appearances for intervenor Williams Natural Gas Company.

David W. Anderson and Patrick G. Golden entered appearances for intervenor Pacific Gas and Electric Company.

Before: WALD, SILBERMAN and WILLIAMS, Circuit Judges.

STEPHEN F. WILLIAMS, Circuit Judge:

In 1985 the Federal Energy Regulatory Commission embarked on a policy of "unbun-

dling" the sale and transportation of natural gas. See Order No. 436, *Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol,* 50 Fed.Reg. 42,408 (1985). Its goal was to give gas consumers direct access to the competitive gas prices available at the wellhead. Because of the market power of interstate pipelines controlling transportation of the gas, and the inadequacy of their incentives to get the best wellhead prices, their customers had not previously—even though the Commission held the pipelines to prices based on cost—enjoyed the benefit of competitive prices. Indeed, as of 1985 the pipelines were subject to billions of dollars of "take-or-pay" obligations—duties under their gas purchase contracts either to take (and pay for) specified quantities of gas or to pay for them without taking them, at prices on average well above then-current market levels. See, e.g., *Associated Gas Distributors v. FERC,* 824 F.2d 981, 995 (D.C.Cir.1987) (*"AGD I "*).

While the unbundling policy gave customers direct access to the wellhead market for the future, a side effect was largely to disable the pipelines from recovering their *existing* supra-competitive contract costs. Customers could avoid these costs by buying directly in the gas market and using the pipelines only for transportation. *Id.* at 1025–26. In *AGD I,* we concluded that Order No. 436 had "abruptly and retroactively subjected [the pipelines to] risk." *Id.* at 1027. We therefore remanded the order to the Commission to consider possible actions to mitigate the burden of take-or-pay liabilities on the pipelines.

The Commission responded to our remand in *AGD I* with Order No. 500, *Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol,* 52 Fed.Reg. 30,334 (1987), which provided for recovery of take-or-pay costs through what the Commission called an "equitable sharing mechanism." Under such a mechanism, a pipeline could, in exchange for agreeing to absorb a specific amount of its take-or-pay costs, recover an equal amount by means of a "direct bill" to its customers, i.e., a flat one-time charge as opposed to an increase in its commodity or demand charge. In Order No. 500 the Commission said that this surcharge would be allocated among a pipeline's customers on the basis of "purchased gas deficiencies" during past periods, i.e., the difference between their purchases in a "deficiency period" and their purchases in a prior "base period." See *Associated Gas Distributors v. FERC,* 893 F.2d 349, 353 (D.C.Cir.1989) (*"AGD II "*).

■ Seeking to follow the Commission's guidance in Order No. 500, Transwestern filed a tariff October 17, 1988, which culminated in a December 16, 1988 Commission order allowing Transwestern to impose a direct bill based on purchased gas deficiencies. *Transwestern Pipeline Co.,* 45 FERC ¶ 61,-427 (1988) (the "1988 Order"). In *AGD II,* however, we held that use of the purchased gas deficiency method violated the filed rate doctrine, which "forbids a regulated entity to charge rates for its services other than those properly filed with the appropriate federal regulatory authority." 893 F.2d at 354–57; *Ark. La. Gas Co. v. Hall,* 453 U.S. 571, 577, 101 S.Ct. 2925, 2930, 69 L.Ed.2d 856 (1981). The Commission then issued Order No. 528, *Mechanisms for Passthrough of Pipeline Take-or-Pay Buyout and Buydown Costs,* 53 FERC ¶ 61,163 (1990), authorizing pipelines to allocate the take-or-pay burden in accordance with buyers' "current contract demand." *Id.* at 61,597. Transwestern accordingly refiled its tariff, seeking in effect to have the now-invalid 1988 Order replaced with one permitting a direct bill based on its customers' 1988 contract demand. The Commission approved the filing. *Transwestern Pipeline Co.,* 54 FERC ¶ 61,356 (1991) (the "1991 Order"), *reh'g granted in part and denied in part,* 64 FERC ¶ 61,145 (1993), *reh'g denied,* 66 FERC ¶ 61,287 (1994).

■ Petitioner Western Resources, Inc. is a customer of Williams Natural Gas Company, which in turn was a customer of Transwestern at the time of the 1988 Order, and remained a customer until February 1, 1989. Because of Commission rulings not here in dispute, Western will be subject to a direct bill from Williams for its share of the take-or-pay costs allocated to Williams under the 1991 Order. Western objects to the 1991 Order on the grounds of the filed rate doctrine. As a central purpose of the doctrine is to enable purchasers to "know in advance the consequences of the purchasing decisions they make," *Transwestern Pipeline Co. v. FERC,* 897 F.2d 570, 577 (D.C.Cir.1990)

**150**

("*Transwestern I* "); see also *Towns of Concord, Norwood, & Wellesley v. FERC*, 955 F.2d 67, 75 (D.C.Cir.1992) (same), it requires that customers receive adequate notice of a rate in advance of the service to which it relates, see, e.g., *Columbia Gas Transmission Corp. v. FERC*, 831 F.2d 1135, 1140 (D.C.Cir.1987), *order on reh'g*, 844 F.2d 879 (1988).

Western argues first that the 1991 Order cannot be given effect because the 1988 Order it replaces failed to give timely notice. The 1988 Order, Western says, was conditional on Transwestern's withdrawal of its judicial appeal of an earlier Commission ruling, and in fact Transwestern withdrew the appeal only on March 2, 1989—*after* Williams had ceased to be a customer of Transwestern. Thus, according to Western, Williams (and Western itself) did not receive adequate notice of the direct bill in the 1988 Order until *after* Williams had stopped buying gas from Transwestern altogether. Second, Western argues, as the direct bill in the 1991 Order uses 1988 contract demand, not the purchased gas deficiency method, the bill approved in 1991 so differs from that approved in 1988 that, again, there was no notice of the direct bill until after Williams had left the Transwestern system. Finally, as Williams at best had notice only on December 16, 1988 of any direct bill for take-or-pay liabilities, it (and Western) should be liable only for liabilities accruing after that date and before its departure from the system. We reject these contentions and affirm the Commission's decision.

\* \* \*

*Fulfillment of Condition in 1988 Order.*

■  The 1988 Order approved Transwestern's filing subject to the condition that Transwestern "*inform* the Commission within five business days . . . of its *election* to pursue this filing or to pursue its pending judicial appeal. . . ." 45 FERC ¶ 61,427 at 62,348 (emphasis added). Transwestern responded to the Commission's order with a December 23, 1988 letter notifying the Commission of its election not to pursue the judicial appeal. The appeal was formally withdrawn March 2, 1989, see 64 FERC ¶ 61,145 at 62,161, after Williams had left the

Transwestern system. Western argues that this sequence is fatal: it did not have unconditional notice of the recovery of take-or-pay costs under the 1988 filing until it was no longer a Transwestern customer.

We need not here address the issue of the degree to which conditional notice may satisfy the filed rate doctrine. Cf. *Transwestern I*, 897 F.2d at 577–79 (noting principles under which a formula rate satisfies the filed rate doctrine even though the absolute numbers may be unknown at the time the customer buys). Western's argument does not get past the starting gate. The condition imposed by the 1988 Order was to "inform" the Commission within five business days of its choice between pursuing the take-or-pay recovery method approved in that order and pursuing its earlier judicial appeal; and that is exactly what Transwestern's December 23, 1988 letter did. Indeed, because Western (under its former name, Kansas Power and Light Company) had intervened in the Commission proceeding involving Transwestern's 1988 filing, see 45 FERC ¶ 61,427 at 62,344, it was served with a copy of the letter. See Addendum D to Brief for Respondent at 2 (certificate of service indicating service on each person designated on the official service list for the proceeding). Accordingly, Western's argument here turns entirely on its mischaracterizing the condition as requiring that Transwestern actually "withdraw" the appeal. As the only requirement was that Transwestern inform the Commission of its election, and it did so both within the time specified and well before Williams left the Transwestern system, the objection need detain us no longer.

*Substitution of Contract Demand for Purchased Gas Deficiency.*

■  As we have said, our decision in *AGD II* invalidated the purchased gas deficiency method embodied in the 1988 Order. Order No. 528 approved instead the use of "current" contract demand, and accordingly Transwestern sought, and the Commission in its 1991 Order approved, a direct bill using customers' 1988 contract demand. See 54 FERC ¶ 61,356 at 62,171. Western argues that the filed rate doctrine precludes Transwestern from allocating costs based on 1988 contract demand, since the 1988 Order did not put Western on notice of such an allocation; indeed, nothing did so until after

Williams had left Transwestern's system February 1, 1989.

In a number of cases, however, we have held that where a pipeline is induced by a Commission decision to file tariffs for recovery of costs by one method, and a judicial decision invalidates a key element of the Commission's approach, the presence of the court challenge may adequately notify customers, for purposes of the filed rate doctrine and the rule against retroactive ratemaking, both of the possible invalidity of the pipeline's initial approach and of the likelihood of an alternative tariff to recover the costs in question. See *Pub. Util. Comm'n of Cal. v. FERC*, 988 F.2d 154, 161–66 (D.C.Cir. 1993) ("*Transwestern III*"); *Natural Gas Clearinghouse v. FERC*, 965 F.2d 1066, 1073–75 (D.C.Cir.1992) (per curiam) (affirming FERC's "remedial authority" to impose "retroactive surcharges upon purchasers of pipeline transport service in order to allow the pipeline to collect a rate that was erroneously disallowed by the Commission"); see also *Transwestern Pipeline Co. v. FERC*, 59 F.3d 222, 228–29 (D.C.Cir.1995) (similar). Were the Commission not able to take remedial action to correct its errors, "pipelines would be substantially and irreparably injured by [Commission] errors, and judicial review would be powerless to protect them from [many] of the losses so incurred." *Natural Gas Clearinghouse*, 965 F.2d at 1074–75. While our cases have often focused on claims that the Commission's remedial action violated the rule against retroactive ratemaking, see, e.g., *Transwestern III*, 988 F.2d at 161–66, we have recognized that this rule and the filed rate doctrine "serve[ ] the same purposes" and "often overlap." *Id.* at 164 n. 9. Indeed, in *Transwestern III*, the precedents on which we drew in analyzing the adequacy of notice involved primarily the filed rate doctrine rather than the rule against retroactive ratemaking. *Id.* at 161–66.

Western argues, however, that the Commission lacked the authority to accept Transwestern's modified filing because Order No. 500 did not *require* Transwestern to use the purchased gas deficiency method struck down in *AGD II* but instead left it free to recover its take-or-pay costs through traditional commodity charges. Western's attempted distinction fails for two reasons.

First, as Western itself acknowledges, an extra commodity charge would have rendered Transwestern's gas prices less competitive—the very problem that accounted for this court's remand in *AGD I*. Thus, in practice, it appears undisputed that Transwestern had little choice but to rely on the allocation method approved by the Commission in Order No. 500.

Second, *Transwestern III* explicitly rejected the customers' argument that remedial retroactive action was impermissible in the absence of a FERC order that "compelled" the pipeline to pursue the course it did. See 988 F.2d at 163. There we thought it sufficient that "the illegal order induced, even if it did not compel" the prior pipeline filings. *Id.* Given the mandate of Order No. 500 and the market constraints on a simple commodity charge increase, the inducement standard was clearly satisfied here. The situation is thus quite different from one in which the pipeline enjoys uncabined discretion in rate-setting and, "having initially filed the rates and either collected an illegal return or failed to collect a sufficient one must ... shoulder the hazards incident to its action including not only the refund of any illegal gain but also its losses where its filed rate is found to be inadequate." *FPC v. Tennessee Gas Co.*, 371 U.S. 145, 153, 83 S.Ct. 211, 215, 9 L.Ed.2d 199 (1962).

Along the same lines, Western argues that our reference in *Columbia Gas* to an "existing method for recovering ... costs," see 831 F.2d at 1138, somehow implies that the existence of an alternative recovery method in that case transformed the charge in question into an invalid retroactive rate, and thereby established a principle that the existence of such an alternative bars the Commission from protecting a pipeline that has acted in reliance on a Commission error. But the reference in *Columbia Gas* appears intended simply to distinguish forward-looking rates from a backward-looking direct bill, see *id.* at 1139 (noting the "contrast"), not to suggest an alternative course of action open to the

pipelines. Indeed, the court expressly refrained from deciding whether the Commission could have allowed advance collection of amounts based on estimates of the costs in question. *Id.* at 1141.

We note that whereas in *Transwestern III* it was the pipeline (among others) that had brought the challenges leading to judicial reversal of the Commission's initial decisions, see 988 F.2d at 159, here Western was among the parties that successfully challenged the purchased gas deficiency method in *AGD II,* precisely on the grounds that it violated the filed rate doctrine. Western also sought rehearing of the Commission's 1988 approval of Transwestern's use of that method. See 66 FERC ¶ 61,287 at 61,821. We see no reason why the customer's initiation of the challenge should disable the Commission from corrective action. Either way, the challenge puts customers on notice of the tentative character of the initially filed rate.

*Charges for Take-or-pay Liabilities Accrued Before the 1988 Order.*

■ Western argues that even if the Commission could retroactively impute the contract demand standard to the 1988 Order as a correction of its legal error, that Order "would have been the first effective announcement that direct billing based on contract demand levels was an option for recovery of take-or-pay settlement costs." Brief for Petitioner at 14. Western then points to *Transwestern I,* where we struck down a Commission decision permitting recovery of "Account No. 191 balances"—shortfalls between pipelines' actual and projected gas costs—from customers that had since left the system, to the extent that the recovery encompassed balances accrued before any announcement that customers would be liable after their departure. See 897 F.2d at 579–80. Accordingly, Western says, only take-or-pay liabilities accruing after the 1988 Order (issued December 16, 1988) can be included in the direct bill.

The Commission responded to this argument by observing that it had regularly treated take-or-pay costs "as current costs as of the date of the pipeline's filing to recover them." 66 FERC ¶ 61,287 at 61,824 n. 32. Treatment of the costs as current was proper, it said, as they were essentially costs of making the transition to open access trans-portation (i.e., the unbundling launched by Order No. 436), a transition that benefitted Williams and Western by enabling Williams to abandon sales service and secure cheaper gas supplies elsewhere. *Id.* In fact, Williams's decision to abandon service—reflected in its notice given February 1, 1988—influenced Transwestern's settlement decisions, as Williams's decision reduced the amount of gas Transwestern could take. As the Commission said:

Now Transwestern had to shed at least the supplies previously maintained to serve Williams. Accordingly, the costs in the October 17 [1988] filing were very much related to Williams' post-filing departure. An allocation to Williams based on its filing date sales contract demand, that it subsequently abandoned, appropriately allocates to Williams costs incurred by Transwestern that were directly related to the current and future benefits that Williams, and its customers, received from open access transportation on and after the date of the October 17, 1988 filing.

*Id.* at 61,824.

Western contests none of these points. In *Transwestern III* we observed that the take-or-pay costs in question "have accumulated less through mismanagement or miscalculation by the pipelines than through an otherwise beneficial transition to competitive gas markets." 988 F.2d at 166. The Commission's treatment of the take-or-pay costs at issue here as "current" as of the date of filing, and as relating to Williams's own sharing in the benefits of the transition, distinguishes the case from *Transwestern I.* Here the Commission's action is, as was true in *Transwestern III,* "an acceptable cost-spreading decision requiring those who benefit from the transition to a competitive natural gas market to absorb some of the costs." *Id.* at 169.

\*   \*   \*

Accordingly, the petition for review is *Denied.*