United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued May 9, 2001 Decided July 13, 2001 

 No. 96-1336

 Canadian Association of Petroleum Producers, 
 Petitioner

 v.

 Federal Energy Regulatory Commission, 
 Respondent

 Inland Pacific Energy Services Corporation, et al., 
 Intervenors

 Consolidated with 
 97-1343

 ---------

 

 

 No. 99-1488

 Canadian Association of Petroleum Producers, et al. 
 Petitioners

 v.

 Federal Energy Regulatory Commission, 
 Respondent

 Northwest Pipeline Corporation, et al., 
 Intervenors

 Consolidated with 
 00-1019, 00-1391, 00-1399

 On Petitions for Review of Orders of the 
 Federal Energy Regulatory Commission

 James H. Holt argued the cause for petitioner Canadian 
Association of Petroleum Producers and supporting interve-
nors Northwest Natural Gas Company, et al. in No. 96-1336. 
With him on the briefs were Jill M. Barker, Robert A. 
Nelson, Jr. and Paula E. Pyron. Sandra E. Rizzo and 
Edward A. Finklea entered appearances.

 Robert A. Nelson, Jr. argued the cause and filed the briefs 
for petitioner Northwest Natural Gas Company in No. 
97-1343.

 Judith A. Albert, Attorney, Federal Energy Regulatory 
Commission, argued the cause for respondent in Nos. 96-1336 
and 97-1343. With her on the brief were Jay L. Witkin, 
Solicitor at the time the brief was filed, and Susan J. Court, 

Special Counsel. Janet K. Jones, Attorney, entered an ap-
pearance.

 Alex A. Goldberg argued the cause for intervenor North-
west Pipeline Corporation in Nos. 96-1336 and 97-1343. 
With him on the brief was Steven W. Snarr.

 Robert A. Nelson Jr. argued the cause for petitioners in 
No. 99-1488 et al. With him on the briefs were Edward A. 
Finklea and James H. Holt.

 Judith A. Albert, Attorney, Federal Energy Regulatory 
Commission, argued the cause for respondent in No. 99-1488 
et al. With her on the brief was Dennis Lane, Solicitor. 
Susan J. Court, Special Counsel, entered an appearance

 Alex A. Goldberg argued the cause for intervenor North-
west Pipeline Corporation in No. 99-1488 et al. With him on 
the brief were Steven W. Snarr and Timothy Muller.

 Before: Williams, Ginsburg and Rogers, Circuit Judges.

 Williams, Circuit Judge: On October 1, 1992 Northwest 
Pipeline Corporation ("Northwest") filed for a general rate 
increase under s 4 of the Natural Gas Act, 15 U.S.C. s 717c, 
to cover costs associated with a previously authorized expan-
sion of its natural gas pipeline facilities. The Federal Energy 
Regulatory Commission rejected certain proposed tariffs, ac-
cepted and suspended other proposed tariffs subject to re-
fund, and set an evidentiary hearing. Almost a decade later, 
in two different consolidated cases, petitioners are seeking 
review of the relevant rate increase, which because of later 
filings by Northwest was in effect only from April 1, 1993 
through October 31, 1994.

 One of the cases involves issues that were resolved before 
we remanded to the Commission to consider the effect of a 
Commission policy change, the other involves issues resolved 
in the course of that remand. The first, Nos. 96-1336 and 
97-1343 concerns five orders, the last of which issued in 
1997.1 The next year, in another proceeding, the Commis-
__________
 1 The five are: Opinion No. 396, 71 FERC p 61,253 (1995); 
Opinion No. 396-A, 76 FERC p 61,068 (1996); 78 FERC p 61,289 
(1997); Opinion No. 396-B, 79 FERC p 61,309 (1997); Opinion No. 

sion shifted positions on an important issue relating to the 
equity rate of return. See Transcontinental Gas Pipe Line 
Corp., 84 FERC p 61,084 at 61,423 (1998), order on reh'g, 85 
FERC p 61,323 (1998), aff'd sub nom. North Carolina Utili-
ties Comm'n v. FERC, 203 F.3d 53 (D.C. Cir. 2000) (unpub-
lished opinion). Because of that shift, we remanded another 
case to the Commission for consideration of its possible effect. 
Williston Basin Interstate Pipeline Co. v. FERC, 165 F.3d 
54, 62-63 (D.C. Cir. 1999). The Commission then sought a 
remand in this case, which we granted.

 The later consolidated case, No. 99-1488 et al., involves the 
five orders issued after the remand.2 On July 14, 1999 the 
Commission promulgated the first such order, finding that 
Northwest was entitled to a re-weighting of the short- and 
long-term growth rates in the equity return calculation. 88 
FERC p 61,057 (1999) ("Initial Post Remand Order"). The 
Commission ordered Northwest to file a recalculation of its 
rates, a plan to impose surcharges to recover excess refunds 
under the previous rates, and pro forma tariff sheets that 
established the appropriate surcharges. Id. at 61,146. The 
Commission denied requests for rehearing. 88 FERC 
p 61,298 (1999) ("Initial Post Remand Order on Rehearing"). 
Northwest filed its tariff sheets in August 1999, using for its 
rate of equity return the median rate of the proxy group. On 
February 11, 2000 the Commission rejected Northwest's com-
pliance filing because it used the wrong long-term growth 
rate, but approved its use of the median return on equity, 
stating that current Commission policy required the Commis-
sion to select the median of the range of reasonable returns 
on equity instead of the midpoint that had been used earlier 
in the rate-making proceeding. 90 FERC p 61,146 at 61,468-

__________
396-C, 81 FERC p 61,036 (1997). Unless stated otherwise, all 
FERC orders cited in this decision have the title "Northwest 
Pipeline Corporation."

 2 88 FERC p 61,057 (1999); 88 FERC p 61,298 (1999); 89 
FERC p 61,238 (1999); 90 FERC p 61,146 (2000); 92 FERC 
p 61,038 (2000).

69 (2000) ("Median Rate Order"). The parties then agreed to 
a long-term growth rate. The Commission denied rehearing 
on the median rate issue. 92 FERC p 61,038 (2000) ("Median 
Rate Order on Rehearing").

 Two parties, Northwest Natural Gas Company ("Northwest 
Natural"), a buyer of Northwest's gas, and the Canadian 
Association of Petroleum Producers ("CAPP"), a representa-
tive of buyers, assert a variety of errors in the Commission's 
decisions. We review the Commission's determinations under 
the Administrative Procedure Act's arbitrary and capricious 
standard. See Missouri Public Service Comm'n v. FERC, 
215 F.3d 1, 3 (D.C. Cir. 2000); 5 U.S.C. s 706(2)(A). We 
dismiss one claim for want of jurisdiction, we reverse and 
remand with respect to another claim, and we affirm on the 
remaining issues. All of the petitioners' claims not addressed 
here have been considered and rejected.

 * * *

 The "just and reasonable" rates calculated by the Commis-
sion under 15 U.S.C. s 717c(a) are typically based on a 
pipeline's costs. Because several of the issues here revolve 
around one component, the cost of equity capital, we pause 
briefly to explain it. Each year that a durable utility asset is 
in use imposes on the utility the annual cost of the capital 
used for its construction (net of amounts already recovered in 
depreciation charges). In order to attract capital, a utility 
must offer a risk-adjusted expected rate of return sufficient 
to attract investors. This return to investors is the cost to 
the utility of raising capital. For the portion of capital 
acquired through bonds, the cost is comparatively easy to 
compute--the interest the company must pay its bondholders. 
Common equity is more complicated, for equity investors do 
not have a legally fixed return. To calculate the rate of 
return necessary to attract them, the Commission measures 
the return enjoyed by the company's equity investors by the 
discounted cash flow ("DCF") model, which assumes that a 
stock's price is equal to the present value of the infinite 
stream of expected dividends discounted at a market rate 

commensurate with the stock's risk. With simplifying as-
sumptions, this can be summarized by the formula

 P = D/(r-g)

where P is the price of the stock at the relevant time, D is the 
dividend to be paid at the end of the first year, r is the rate of 
return and g is the expected growth rate of the firm. See 
Illinois Bell Telephone Co. v. FCC, 988 F.2d 1254, 1259 (D.C. 
Cir. 1993); see also A. Lawrence Kolbe et al., The Cost of 
Capital: Estimating the Rate of Return for Public Utilities 
53-55 (1984). Since r is what the Commission is seeking, the 
equation is rearranged to the form

 r = D/P + g

Illinois Bell, 988 F.2d at 1259.

 For a company that is not publicly traded, market-
determined figures for P and D will be missing, and the 
Commission has recourse to calculating the implicit rate of 
return on companies that are comparable (or at least compa-
nies whose business is predominately the operation of natural 
gas pipelines) and publicly traded. These companies are 
called the "proxy group." The Commission then makes ad-
justments for specific characteristics of the company whose 
rates are in question. Here, one of the issues involves a 
contention that Northwest's business risk was comparatively 
low (so that, petitioners argue, the Commission should have 
chosen a rate at the low end of those of the proxy group). 
Another issue involves calculation of the expected growth 
rates for the proxy group. And a third, assuming that 
Northwest belongs in the middle of the proxy group, involves 
how to pick a number best representing the middle.

 * * *

1. Inclusion of Over-Run Costs in Rate Base

 In its expansion project Northwest added considerable 
mainline pipeline and compressor facilities and services. Its 
original filing included $371.2 million in project costs but it 
ultimately persuaded the Commission to include about $61 
million more. Because of decisions adverse to Northwest on 

other issues, the rates approved were lower than those for 
which it had originally filed. See 71 FERC p 61,253 at 
61,992-95 (1995)("Opinion No. 396"), reversed in part and 
remanded, 76 FERC p 61,068 at 61,420-24 (1996) ("Opinion 
No. 396-A").

 Northwest Natural claims that Northwest should not be 
permitted to incorporate into its rate base costs that were not 
included in its original filing. Its back-up position is that 
even if consideration of those costs was proper, the Commis-
sion should have reopened proceedings to consider its claim 
that about $48 million in costs was not actually paid within 
the "test period" (twelve consecutive months used, with ad-
justments, in estimating a pipeline's costs) and should have 
been excluded.

 On the first claim, Northwest Natural argues that an 
earlier Commission decision, Natural Gas Pipeline Co. of 
America, 38 FPC 1136 (1967), governs how the Commission 
must deal with cost figures that differ from those of the initial 
filing. It places special reliance on a phrase of that decision 
saying that the regulations "bind Natural to its case-in-chief 
as submitted." Id. at 1148. The phrase is indeed there, but 
the Commission went on to make clear that there was no flat 
rule against new data; instead it performed a contextual 
analysis. There (1) the evidence did not fit the very limited 
subject of the hearing; (2) because of that disjuncture there 
was a risk that other parties would reasonably assume that 
the evidence would not be considered (and accordingly these 
parties would lack effective notice); and (3) the new cost 
evidence in fact did not meet the Commission's requirement 
that changes in costs after the test period be "known and 
measurable." Id. at 1148-50 (internal quotation omitted). 
None of these characteristics was present here. The Com-
mission found that because Northwest's revised costs were 
disclosed prior to the filing of direct testimony in the hearing 
before the Administrative Law Judge, that the parties had 
ample notice of the cost claims, and that such claims, though 
estimates, were known and measurable. See Opinion No. 
396-A, 76 FERC at 61,423-24.

 In its second claim Northwest Natural argues that the 
Commission unlawfully refused to reopen proceedings to hear 
its claim that Northwest had not actually paid all of the 
expansion costs within the test period. The claim has two 
strikes against it. First, although Northwest Natural was 
aware of the change in plant costs well before direct testimo-
ny was filed in the ALJ hearing, it failed to raise the issue 
there, and did not do so until the record closed. Id. at 61,420. 
Northwest Natural's justification for the delay, if any, is 
obscure. Second, Northwest Natural's position on the merits 
depends on its effort to transform the Commission's general 
practice of not including costs paid after the test period into 
an absolute bar. But the Commission has discretion to 
consider costs outside of the test period. See, e.g., Exxon 
Corp. v. FERC, 114 F.3d 1252, 1263 (D.C. Cir. 1997). Here it 
is uncontested that Northwest placed the expansion facilities 
in service before the end of the test period, i.e., just before 
the start of the period for which the rates were charged. 
Payment in some cases occurred after the end of the test 
period, but only because some bills had not been paid by that 
day, some incurred costs had not been billed, and some sums 
were withheld by Northwest pending final completion of the 
work. See Nos. 96-1336 and 97-1343, Joint Appendix 
("J.A.") at 390.

 Northwest Natural also claims discriminatory treatment in 
the Commission's reopening refusal, as the Commission did 
reopen proceedings to consider the long-term growth projec-
tions. But it did so exclusively in light of its own intervening 
decision in Ozark Gas Transmission System, 68 FERC 
p 61,032 at 61,105 (1994), announcing a new policy to include 
such projections. Such an effort by the Commission to 
assure that it applies similar principles in simultaneously 
pending cases may be obligatory. See Williston Basin, 165 
F.3d at 61-63. It supplies, in any event, an ample basis for 
the Commission's different treatment of the two requests for 
reopening. Cf. American Financial Services Ass'n v. FTC, 
767 F.2d 957, 964-65 n.5 (D.C. Cir. 1985) (noting Commission 
discretion to reject belated claims).

2. Assessment of Northwest's Business Risk

 As part of its process to determine Northwest's rate, the 
Commission assessed Northwest's costs of capital. This esti-
mation required, under the DCF method that the Commission 
used, calculating the implicit equity rate of return for a proxy 
group of supposedly similar corporations, and then determin-
ing where Northwest belonged within that group, in large 
part on the basis of Northwest's business risk. CAPP com-
plains that the Commission didn't adequately consider evi-
dence suggesting that Northwest's business risk was in fact 
lower than the average of the proxy group, so that it erred in 
assigning Northwest a rate based on the middle of the proxy 
group range. CAPP's theory was that Northwest was more 
like the "pure" pipeline companies within the proxy group, 
which had lower rates of return, than like the companies with 
more diversified operations. We do not review the merits of 
CAPP's petition because it is procedurally barred.

 Four of the Commission's orders prior to our remand are 
relevant. We start with a very simple summary of each 
relevant order, what it did, and the nature of CAPP's petition 
for rehearing in the instances where it filed one.

 Opinion No. 396. The Commission rejected CAPP's 
 contention that Northwest's business risk was below the 
 average of the proxy group. 71 FERC p 61,253 at 61,992 
 (1995). CAPP petitioned for rehearing, raising the issue 
 of business risk.
 
 Opinion No. 396-A. The Commission remanded the 
 matter to the ALJ for development of a record on long-
 term growth rates. 76 FERC p 61,068 at 61,419 (1996). 
 It said nothing at all about the business-risk issue. 
 CAPP did not seek rehearing, but petitioned for review 
 in this court of both Opinion No. 396 and Opinion No. 
 396-A.
 
 Opinion No. 396-B. Following the proceedings before 
 the ALJ, the Commission identified a new range of rates 
 for the proxy companies and selected the mid-point of 
 that range as appropriate for Northwest. 79 FERC 
 p 61,309 at 62,384-86 (1997). Northwest sought rehear-
 
 ing in a petition that did not mention the business risk 
 issue.
 
 Opinion No. 396-C. The Commission disposed of the 
 petitions for rehearing. 81 FERC p 61,036 (1997). 
 Northwest petitioned for review here.
 
 The Commission argues that neither of the first two opin-
ions, No. 396 or No. 396-A, was final, which is a prerequisite 
to our review. See Transwestern Pipeline Co. v. FERC, 59 
F.3d 222, 226 (D.C. Cir. 1995). That seems obvious for 
Opinion No. 396-A, as it remanded the matter to an ALJ. 
See id. ("An order is considered final when it imposes an 
obligation, denies a right, or fixes some legal relationship, 
usually at the consummation of an administrative process.") 
(internal quotation omitted). Opinion No. 396 was presum-
ably a final decision when issued, but when CAPP sought 
rehearing under s 19(a) of the Natural Gas Act, 15 U.S.C. 
s 717r(a) (as it was required to do if it wished to preserve its 
right to appeal, see s 19(b), 15 U.S.C. s 717r(b)), its petition 
suspended the finality of Opinion No. 396 as applied to CAPP 
and precluded appeal until the Commission fully resolved the 
rehearing request by way of another final order. See Ten-
nessee Gas Pipeline Co. v. FERC, 9 F.3d 980, 980-81 (D.C. 
Cir. 1993). Cf. Bellsouth Corp. v. FCC, 17 F.3d 1487, 1489-90 
(D.C. Cir. 1994). Because Opinion No. 396-A itself was non-
final, CAPP's petition for review of both decisions was juris-
dictionally defective.

 CAPP did, however, seek review of Opinion No. 396-C, 
thereby bringing up issues properly preserved from Opinion 
No. 396-B. But was the business risk issue, raised only on 
rehearing of Opinion No. 396, preserved? Section 19(b)'s 
rehearing requirement itself applies "not to the issue in-
volved, but to the order that comes before us for review." 
Kansas Cities v. FERC, 723 F.2d 82, 85 (D.C. Cir. 1983) 
(construing materially identical language in s 313(a) of the 
Federal Power Act); see also Arkansas Louisiana Gas Co. v. 
Hall, 453 U.S. 571, 577 n.7 (1981) (discussing established 
practice of citing interchangeably provisions of the Natural 
Gas Act and the Federal Power Act that are substantially 

identical in all material respects). As our review applies only 
to final orders, all appealable claims must generally be set 
forth in a petition for review of the final order itself. Of 
course, a party that has petitioned for rehearing and seen its 
petition denied without significant modification to the order 
may then proceed directly to court without filing a new 
petition for rehearing of the denial; imposing an additional 
rehearing requirement in this situation would lead to infinite 
regress and serve no useful end. See Town of Norwood v. 
FERC, 906 F.2d 772, 775 (D.C. Cir. 1990); Southern Natural 
Gas Co. v. FERC, 877 F.2d 1066, 1072-73 (D.C. Cir. 1989); 
see also Kansas Cities, 723 F.2d at 86. Similarly, if a party 
properly seeks rehearing and secures modification of some 
parts of an order, it may go directly to court on the issues as 
to which there was no modification without seeking rehearing 
again on those issues; only on matters where the rehearing 
order introduces a new source of complaint need the party 
file another rehearing petition. Norwood, 906 F.2d at 775; 
Tennessee Gas Pipeline Co. v. FERC, 871 F.2d 1099, 1109-10 
(D.C. Cir. 1989). And we will assume without deciding that if 
a party does raise such new issues on rehearing it need not 
include its old complaints about the unmodified parts.

 In the present case, however, several stages of agency 
review and modification separate Opinion No. 396-B from 
CAPP's petition for rehearing of Opinion No. 396--proceed-
ings before the ALJ on the long-term/short-term weighting 
issue, followed by Commission resolution of that issue and its 
selection of a new equity rate of return for Northwest. 
Enforcement of the rehearing requirement in this context 
serves not merely to inform the Commission of issues that 
may be appealed, but ensures certainty in the dispute pro-
cess, apprising potentially settling parties of what issues 
remain contested. See ASARCO, Inc. v. FERC, 777 F.2d 
764, 773-74 (D.C. Cir. 1985). We note, moreover, that CAPP 
does not argue, nor do we see any basis for finding, that its 
failure to preserve its right to appeal was justified under the 
"reasonable ground" exception to Section 19(b)'s rehearing 
requirement. Accordingly, CAPP's petition is dismissed for 
lack of jurisdiction.

3. Weighting of Short- and Long-Term Growth Rates.

 On remand, the Commission changed the weighting of 
short- and long-term growth rates, now giving short-term 
rates twice the weight of long-term ones, rather than weight-
ing them equally as before. The petitioners claim that the 
Commission failed to explain its decision generally or to 
distinguish Ozark Gas Transmission System, 68 FERC 
p 61,032 (1994), where the Commission approved an equal 
weighting of all years of an 18-year period. Id. at 61,107 
n.46. To explain its decision, the Commission quoted its 
reasoning in Transcontinental Gas Pipe Line Corp., 84 
FERC p 61,084 at 61,423 (1998):

 [W]hile determining the cost of equity nevertheless re-
 quires that a long-term evaluation be taken into account, 
 long-term projections are inherently more difficult to 
 make, and thus less reliable, than short-term projections. 
 Over a longer period, there is a greater likelihood for 
 unanticipated developments to occur affecting the projec-
 tion. Given the greater reliability of the short-term 
 projection, we believe it is appropriate to give it greater 
 weight. However, continuing to give some effect to the 
 long-term growth projection will aid in normalizing any 
 distortions that might be reflected in short-term data 
 limited to a narrow segment of the economy.
 
Initial Post Remand Order, 88 FERC at 61,144; see also 
Initial Post Remand Order on Rehearing, 88 FERC at 61,910. 
The Commission was obviously aware that the apparent 
relative reliability of short-term growth projections (due to 
temporal proximity) was to some degree offset by variability; 
it decided to use the long-term projections to "normaliz[e] any 
distortions" in the short-term expectations. In an exercise so 
hard to limit by strict rules, it would likely be difficult to show 
that the Commission abused its discretion in the weighting 
choice. Certainly petitioners offer no reason for us to find 
that it has done so here. Its reason for giving extra weight 
to the short-term estimates implicitly justified its change 
from Ozark.

4. Choice of the Median Rate of Return on Equity.

 On remand the Commission also changed its method of 
selecting an equity rate of return from the array of rates of 
the proxy group. Before the remand it had chosen the 
"midpoint" rate of the group--the average of the single 
lowest and single highest rates. See Tennessee Gas Pipeline 
Co. v. FERC, 926 F.2d 1206, 1213 (D.C. Cir. 1991) (stating 
that the midpoint is a "starting place"). When Northwest 
submitted its pro forma tariff sheets as mandated by the 
Commission's July 14, 1999 order, however, it recalculated its 
rates using the median of the proxy group (the middle rate 
out of the five), which the Commission approved. See Medi-
an Rate Order, 90 FERC at 61,468. When the short- and 
long-term growth rates had been equally weighted, the mid-
point rate was higher than the median rate, leading to a 
higher overall pipeline rate. With the change in weighting, 
the reverse was true. See Median Rate Order on Rehearing, 
92 FERC at 61,095, 61,101. Petitioners estimate that the 
difference between the midpoint (13.33%) and median 
(13.67%) spells $3.2 million in added charges. They raise two 
objections. First, they claim that the Commission had no 
authority to reconsider how it selected a rate from the proxy 
group under the scope of our remand. Second, they argue 
that the Commission's choice of the median was unreasonable.

 We remanded to the Commission to enable it "to reconsider 
its decisions in light of Williston Basin v. FERC, 165 F.3d 54 
(D.C. Cir. 1999)." See Canadian Ass'n of Petroleum Produc-
ers v. FERC, No. 96-1336 (D.C. Cir. Mar. 26, 1999) (order 
remanding case), Petitioners' Br. at Addendum B. This 
prescribed affirmatively what the Commission was required 
to do--reconsider the weighting issue that was directly affect-
ed by Williston. But under our cases such a remand restores 
jurisdiction to the Commission and "discretion to reconsider 
the whole of its original decision." Southeastern Michigan 
Gas Co. v. FERC, 133 F.3d 34, 38 (D.C. Cir. 1998). Because 
the Commission was within its authority to reconsider which 
rate of return to use, we reach the question whether the 

Commission provided a reasoned explanation for choosing the 
median over the midpoint or alternatively the mean.

 The Commission's orders and brief speak only to the choice 
between median and midpoint. Its orders pointed to the 
Transcontinental decision, where, besides changing the 
weighting of short- and long-term growth factors, it also 
selected the median instead of the midpoint. But it supplied 
only the most limited reasoning there. See Transcontinental 
Gas Pipe Line Corp., 84 FERC at 61,427-5. The Commis-
sion essentially reiterated its Transcontinental reasoning in 
this case:

 [U]se of the median gives consideration to more of the 
 proxy company numbers. The median is the point at 
 which half of the numbers are higher and half are lower. 
 The midpoint, on the other hand, merely represents an 
 average of the highest and lowest of the numbers and 
 completely disregards the middle three numbers.
 
Median Rate Order on Rehearing, 92 FERC at 61,095.

 To a large extent this "explanation" merely describes the 
differences in calculating the median and the midpoint. Inso-
far as it seeks to justify on the basis of the number of 
numbers considered, it is not wholly accurate. The midpoint 
doesn't "completely disregard[ ] the middle three numbers"; 
the highest and lowest numbers achieve their status by 
reference to all five numbers. But even if acceptable as an 
explanation for choosing the median over the midpoint, it fails 
as an explanation for rejecting petitioners' proposal that the 
Commission use the simple arithmetic mean (either of all five, 
or of the middle three companies of the proxy group). See 
No. 99-1488 et al., J.A. at 105, 171, 192-93. The mean of the 
five, after all, rather directly "uses" all the numbers and 
weights them all equally, as petitioners pointed out. Id. at 
192-93.

 The Commission simply dismissed the alternative proposal 
in conclusory terms. See Median Rate Order, 90 FERC at 
61,468; Median Rate Order on Rehearing, 92 FERC at 
61,094. Counsel for Northwest suggested at oral argument 

that there was Commission precedent for the view that the 
median is to be preferred to the average "as a [measure] of 
central tendency in cases in which the distribution is highly 
skewed." See No. 99-1488 et al., Oral Arg. Tr. at 22. But 
the Commission never offered such an explanation, and coun-
sel did not offer an analysis of Commission precedents from 
which we could infer that the "skewing" here was such that 
choice of the median was foreordained. See SEC v. Chenery 
Corp., 332 U.S. 194, 196 (1947); cf. Health & Medicine Policy 
Research Group v. FCC, 807 F.2d 1038, 1045 (D.C. Cir. 1986).

 The Commission's failure to respond meaningfully to calls 
for using an average rate of all or of three of the proxy group 
companies renders its decision to use the median rate arbi-
trary and capricious. See City of Brookings Municipal 
Telephone Co. v. FCC, 822 F.2d 1153, 1169 (D.C. Cir. 1987). 
Unless the Commission answers objections that on their face 
seem legitimate, its decision can hardly be classified as rea-
soned. See International Harvester Co. v. Ruckelshaus, 478 
F.2d 615, 648 (D.C. Cir. 1973); see also Tesoro Alaska 
Petroleum Co. v. FERC, 234 F.3d 1286, 1294 (D.C. Cir. 2000). 
We thus reverse and remand the case to the Commission for 
reconsideration of its choice of the proxy group's median rate.

5. Imposition of Surcharges

 The Commission determined on remand that it had improp-
erly reduced Northwest's rates in its first series of orders and 
consequently ordered Northwest to impose surcharges to 
recover those excess refunds from its shippers. Petitioners 
claim that the surcharges violated the filed rate doctrine, 
"which forbids a regulated entity to charge rates for its 
services other than those properly filed with the appropriate 
federal regulatory authority," Arkansas Louisiana Gas Co., 
453 U.S. at 577, and are thus unauthorized. Petitioners make 
no claim that the ultimately effective rate (net of refunds and 
surcharges) exceeded that of Northwest's original filing.

 Petitioners rely on Natural Gas Clearinghouse v. FERC, 
965 F.2d 1066 (D.C. Cir. 1992), to argue that Northwest could 
not collect surcharges unless it had explicitly reserved its 

right to impose surcharges under the tariffs that produced 
the refunds. But petitioners read too much into Clearing-
house. Although the pipeline in that case had specifically 
reserved the right to impose surcharges when it was ordered 
to file a new, lower tariff, we did not hold that such a 
reservation was necessary. So long as the parties had ade-
quate notice that surcharges might be imposed in the future, 
imposition of surcharges does not violate the filed rate doc-
trine. "The filed rate doctrine simply does not extend to 
cases in which buyers are on adequate notice that resolution 
of some specific issue may cause a later adjustment to the 
rate being collected at the time of service." Id. at 1075. (It 
is not even clear that the refunds were paid during the period 
service was actually being provided under the "locked-in" rate 
at issue here. But petitioners lose whether they were or 
were not.) The Commission reasonably concluded that 
Northwest's initial rate filing--combined with the ongoing 
litigation and absence of a final, non-appealable order--pro-
vided the necessary notice to the shippers that they might 
have to pay rates up to the level originally filed. See Western 
Resources, Inc. v. FERC, 72 F.3d 147, 151 (D.C. Cir. 1995).

 * * *

 CAPP's petition for review is dismissed for want of juris-
diction on the business-risk issue. The case is reversed and 
remanded to the Commission for further consideration of the 
selection of the median rate of return on equity from the 
proxy group. Otherwise, the petitions are denied.

 So ordered.